LOVE *v.* COUCH.

Opinion delivered June 9, 1930.

*John M. Rose,* for appellants.

*Robinson, House & Moses* and *Harry E. Meek,* for appellees.

BUTLER, J. The appellants were the owners of oil properties in Union County on which two or more small producing wells had been brought in. In November, 1921, for reasons about which there is some dispute, an arrangement was effected by which these properties were purchased by the appellee, to be developed and operated by a corporation. The terms of the agreement were set out in the following instrument:

"This memorandum of agreement, made this the 7th day of November, 1921, by and between H. C. Couch and associates, M. W. Love and Love Brothers, Incorporated, witnesseth:

"That M. W. Love and Love Brothers, Incorporated, are the owners of the following described properties, to-wit:

"(1) 10 acres, section 31, Rodgers lease, Union County, Arkansas; one-fifth interest of Love Brothers and two-fifths interest of M. W. Love. Well No. 1 producing 112 bbls. per day. Well No. 2 producing 35 bbls. per day.

"(2) 10 acres, section 8, Pratt lease, Union County, Arkansas; one-fourth interest of Love Brothers. Well No. 1 capped. The first $14,500 worth of oil from this well to go to Couch interest. Well No. 2 producing 200 bbls. per day. Well No. 3 drilling. Debt of $6,000 out of first oil from this well to go to Harrell & Hatcher, drillers, $1,500 of which Couch interests pay.

"(3) 5 acres, section 17, Calvert lease, Union County, Arkansas; 51 per cent. interest of Love Brothers, Inc. Well No. 1 producing 200 bbls. per day.

"(4) 10 acres, section 8, DeCou lease, Union County, Arkansas; one-half interest of Love Brothers, Incorporated. Well No. 1 producing 65 bbls. per day. Well No. 2 drilling, to be completed by Love Brothers, Incorporated, Couch and associates to pay $6,250 of said drilling expense, to be deducted from purchase price, and Love Brothers to bear like expense.

"(5)  10 acres, section 20, Pendleton lease, Union County, Arkansas; one-half of 51 per cent. interest of Love Brothers. Well No. 1 to be completed by Love Brothers, including flow lines, separators and two 1,200-bbl. wooden tanks, free of any cost to Couch and associates. Operation of this lease to be vested in Couch from date of transfer.

"(6)  20 acres, section 5-19-15, Greenwood lease, Union County, Arkansas; 5-16 interest of Love Brothers. Well No. 1 to be drilled by Love Brothers, Incorporated, free of any expense to Couch and associates. Flow lines, tanks and standardization to be paid equally by Love Brothers and Couch and Associates.

"(7)  Couch and associates to have full ownership of royalty on the 40 acres in section 31.

"(8)  Couch and associates to have full ownership of the 700 acres of wildcat leases, description of which is attached hereto, and made a part hereof, marked exhibit A.

"(9).  Whereas, Couch and associates expect to consolidate all oil property interests in the El Dorado field into one company, possibly under the corporate name of 'The Southwestern Oil Company,' the company so formed agrees to take over and pay for said properties in the following manner, to-wit:

"(10)   In cash upon consummation of this deal ........................................$ 5,000.00

Upon completion of Greenwood well No. 1................................. 7,500.00

(a)   To be paid Love Brothers, Incorporated, and M. W. Love, monthly from net earnings of the property interests herein conveyed in the manner described below ............................. 19,000.00

(b)   Indebtedness of Love Brothers, Incorporated, to be satisfactorily

adjusted and paid by Couch
and Associates ........................................ 45,000.00

Total ................................................$76,500.00
Paid by Couch and Associates
toward drilling of well No. 2
DeCou ................................................ 6,250.00

Total ................................................$82,750.00

"(a) It is agreed and understood by and between the parties hereto that Love Brothers, Incorporated, and M. W. Love, shall receive 20 per cent. of the net earnings accruing from the property interests herein conveyed until Couch and associates have been reimbursed for the $12,500 advanced under article 10 hereof, after which they shall receive 25 per cent. of such net earnings until they have been paid the aggregate sum of $19,000.

"(b) It is further agreed that Couch and associates, through the corporation to be formed, shall satisfactorily adjust and pay the outstanding obligations of Love Brothers, Incorporated, as minutely set forth in the attached list marked 'Exhibit B,' from 60 per cent. of the net earnings of the property interests herein conveyed until Couch and Associates shall have been reimbursed for the $12,500 advanced under article 10 hereof, after which 75 per cent. of such net earnings shall be applied to the retirement of said indebtedness.

"(11) Upon retirement of the total indebtedness, including the item of $19,000 due Love Brothers, Incorporated, and M. W. Love, and $45,000 outstanding obligations, M. W. Love and Love Brothers, Incorporated, are to receive without cost $75,000 in stock at par of the oil company to be formed by Couch and Associates, said stock to be deposited in escrow upon consummation of this deal for delivery when retirement of said indebtedness shall have been accomplished.

"(12) All earnings from the Rogers and DeCou leases from October 1, 1921, and all earnings from the

Pratt and Calvert leases after October 17, 1921, shall go to Couch and associates.

"(13) The sum of $15,000 derived from sales of 7/8 of the first oil produced from Pendleton Well No. 1, is due Love Brothers, Incorporated, of which Couch and associates are to receive $75,000.

"(14) It is further agreed that Love Brothers, Incorporated, and M. W. Love shall use their best endeavors to secure and turn over to Couch and associates, either by direct purchase, or under an operating agreement, control of the Pratt lease as described under article 10 hereof, and that as the wells now drilling are completed the control and operation thereof are to pass to the purchaser.

"(Signed) H. C. Couch and Associates,
"Love Brothers, Inc.
"By M. W. Love, President.
"By J. W. Love, Vice-President.
"(Signed) By K. J. Michel, Secretary,
"By M. W. Love."

At the time the contract was executed, a corporation existed bearing the name of the Southwestern Oil Company, of which H. C. Couch was president, with an authorized capital stock of $500,000, only $300 of which had been issued and which corporation held title to certain oil properties. Instead of organizing a new corporation to take over the properties acquired from the appellants, the existing corporation was utilized, and the appellants conveyed to it the properties described in the contract. At the time of the execution of the contract and for some time before, the production of the properties had been slowing down and their value diminishing. When they were being operated under the aforesaid contract, the production became progressively less, so that finally they could not longer be operated at a profit, and in the latter part of October, 1922, operation of the properties was abandoned. It is not seriously contended that the properties were mismanaged or that they could no longer be

made profitable. The appellants were paid the cash items of $5,000 and $7,500 and $6,250 as stipulated. A payment was made on the $19,000 item which reduced that item to $16,417.74. The $45,000 item was reduced by various payments to the appellants' creditors to $18,614.69, for which balance the appellants were liable. A small balance against the appellants on another transaction was deducted, the balance then remaining being $34,865.26. These are the transactions from which this litigation arose and from a decision adverse to the appellants (plaintiffs below) is this appeal.

A number of points are presented by counsel for the litigants in their able and exhaustive briefs, but the main question, which is largely determinative of the issues involved, depends on a single proposition and is involved in the construction of article 10 of the contract set out above. It is a familiar rule of construction that contracts should be interpreted so as to give effect to the intention of the parties, which is to be ascertained by a consideration of the instrument as a whole and of each part in connection with other related paragraphs. Where the language used is of doubtful import, the situation of the parties and the attendant circumstances should be considered and that construction should be adopted which is most fair and reasonable. But, when the language used leaves no doubt as to its meaning, it is conclusive as to the intention of the parties and must be enforced as written. With this elementary proposition of law in mind we proceed to an examination of article 10 of the contract to determine whether as to the items of $19,000 and $45,000 (the only items in controversy) there was an absolute and unconditional promise to pay as contended by the appellants, or whether the same were conditional and contingent upon the happening of some other event as is the contention of the appellees.

It is clear from a consideration of the entire contract that the $5,000 item and the $7,500 item first mentioned in article 10, amounting to $12,500, were paid in cash by

Couch at or about the time of the execution of the contract. Item A, article 10, is as follows: "(a) To be paid Love Brothers, Incorporated, and M. W. Love, monthly from net earnings of the property interests herein conveyed in the manner described below, $19,000." In the same article appears clause "A": "(a) It is agreed and understood by and between the parties hereto that Love Brothers, Incorporated, and M. W. Love, shall receive 20 per cent. of the net earnings accruing from the property interests herein conveyed until Couch and Associates have been reimbursed for the $12,500 advanced under article 10 hereof, after which they shall receive 25 per cent. of such net earnings until they have been paid the aggregate sum of $19,000."

Item "b" of article 10 is as follows: "(b) Indebtedness of Love Brothers, Incorporated, to be satisfactorily adjusted and paid by Couch and associates, $45,000," and clause "b"; "(b) It is further agreed that Couch and associates, through the corporation to be formed, shall satisfactorily adjust and pay the outstanding obligations of Love Brothers, Incorporated, as minutely set forth in the attached list marked 'Exhibit B,' from 60 per cent. of the net earnings of the property interests herein conveyed until Couch and Associates shall have been reimbursed for the $12,500 advanced under article 10 hereof, after which 75 per cent. of such net earnings shall be applied to the retirement of said indebtedness."

As to item "a," it, standing alone within itself, clearly indicates how the $19,000 shall be paid direct to Love Brothers, Incorporated; as to item "b," as explained by its related clause "b" following, it is equally clear how the $45,000 item should be paid. Both items "a" and "b" are to be paid out of the net earnings of the *properties conveyed,* and, as there is nothing else in the contract which in any way refers to these items and further explains or limits the terms of their companion clauses, it follows that the payments are limited and conditional on the net earnings of the properties. We must

hold the language unambiguous and conclusive as to the intention of the parties. Therefore, the parol evidence tending to contradict or alter these plain provisions of the written contract was incompetent. As the properties since October 22, 1922, could, and can, no longer be operated at a profit, the appellants were entitled to receive on item "a" and to have applied to item "b," in the manner stated in the companion clauses, only the net profits already realized, and this, in effect, is the application of the rule hereinbefore stated made by the chancellor to the facts in the case at bar, in which he is supported by our decision on an analogous state of facts in the cases of *Gilbert* v. *Patterson,* 174 Ark. 61, and *Hirsch* v. *Cadrin,* 178 Ark. 209, 10 S. W. (2d) 2.

It is the theory of the appellants .that H. C. Couch is personally liable under the terms of the contract, while the appellees insist that the $19,000 and the $45,000 items were to be paid merely from the net profits derived from the operation of the Love properties, "if, as and when such profits were realized (which theory a proper construction of article 10 justifies) and responsibility for making such payments out of profits of operation was placed entirely on the corporation acquiring the properties and not on Couch personally"—in short, that the corporation was personally liable, and not Couch. Treating the contract as ambiguous in so far as this question is concerned and the parol testimony adduced legitimate to ascertain its true meaning in that regard, this testimony was conflicting; that of the appellants tending to establish appellee's personal obligation for the payment of said items in accordance with the provisions of article 10, and that of the appellee supported by the testimony of others tending to negative this contention. The trial judge adopted that view of the evidence tending to establish the contention of the appellees. It is earnestly insisted by counsel for the appellants that, when the value of the properties conveyed is considered, the financial standing of Couch, and the uncertainty as to the financial

standing of a prospective corporation, are taken into account, the contention of the appellees as to the non-liability of Couch is unreasonable, and that these facts, taken into consideration with the testimony of the appellants as to their understanding as to who should pay the items in question, makes the finding of the chancellor against the preponderance of the testimony. On the other hand, it is as seriously contended that the circumstances attendant upon the transaction are persuasive that Love Brothers, Incorporated, was so financially embarrassed that it could no longer develop and operate the properties which were showing marked diminution in producing power; that the values of these properties were highly speculative, and that a careful analysis of the testimony discloses that they were in fact, even on a speculative basis, worth no more than the purchase price named in the contract, and that the cash of $18,750, with the prospect of the further development and operation of the properties and the forbearance of the creditors, made it not at all unreasonable that the agreement should be as contended by the appellees.

We have carefully examined and considered the evidence in support of these respective contentions and cannot say that the judgment of the trial court in upholding the contention of the appellees was against the preponderance of the evidence, or that the circumstances warranted the assumption that the finding was unreasonable. Therefore, under the established rules of procedure, the finding of the trial court will not be disturbed.

It is insisted, however, that the net profits were greater than shown by the audit because of certain items under the head of "General Expenses" which were not proper charges against the production, in that these items were the expenses of the corporation as a whole which was operating other properties besides those acquired from the appellants, and while the appellee was not liable (as found by the chancellor) under the terms of the written contract as explained by the parol testimony, he

was, and is, personally liable under the terms of § 1726 of Crawford & Moses' Digest, because as president of the corporation he failed to make and file the annual statement prescribed by § 1715, *ib.* The appellants are in error in this contention. The corporation was organized in April, 1921; the properties were taken over in November of that year, and operations ceasing October 22, 1922, the liability, if any, became fixed on that date.

In the appellants' original complaint filed September 16, 1925, the cause of action stated was for a breach of contract. Various amendments were filed to the complaint, among which was one filed August 5, 1926, in which an independent cause of action than that stated in the original complaint or in any of the preceding amendments was alleged, namely, a statutory liability based on § 1715 and § 1726, *supra.* The period of limitation applicable for the enforcement of statutory liability is three years. *McDonald* v. *Mueller,* 123 Ark. 233; *Zimmerman* v. *W. & S. Fire Ins. Co.,* 121 Ark. 408. The statutory cause of action was not included in the original complaint and the statute of limitations was not tolled by its filing, but continued to run until the filing of the amendment August 5, 1926, at which time the statute bar had attached. *Cottonwood Lumber Co.* v. *Walker,* 106 Ark. 108.

It is insisted by the appellants that the amendment will relate back to the filing of the original complaint, citing *Holland* v. *Rogers,* 33 Ark. 251, and *Western Coal & Mining Co.* v. *Corkille,* 96 Ark. 388, 131 S. W. 963, in support of this contention. But those cases are not authority for the contention made in the instant case for the reason that the amendment of August 4, 1926, was not an amplification of the cause of action set out in the complaint first filed or of any of the amendments thereto, but was an independent and distinct cause of action, and an adverse judgment on the cause of action alleged in the original complaint would not be a bar to recovery on the cause of action stated in the amendment of August 5,

1926. *McDonald* v. *Mueller, supra; Cottonwood Lbr. Co.* v. *Walker, supra;* 34 C. J., page 802. It follows from the view above expressed that the decree of the chancellor is in all things correct, and it is therefore affirmed.