FULK *v.* GAY, TRUSTEE.

4-8961                                          226 S. W. 2d 69

Opinion delivered January 23, 1950.

*Baucum Fulkerson* and *Rose, Dobyns, Meek & House,* for appellant.

*Barber, Henry & Thurman,* for appellee.

SCOTT WOOD, Special Justice. This is an action to determine who should receive the funds in the hands of a trustee at the termination of the trust. The trust was created to carry out a debt adjustment plan in a proceeding under the National Bankruptcy Act.

## STATEMENT OF THE CASE

The events culminating in this litigation began in May, 1929, when Augustus M. Fulk and other members of his family borrowed $362,500 from a bank and mortgaged certain Little Rock real property to secure the loan. The bank transferred to various persons the notes which had been given as evidence of this indebtedness. The debtors failed to pay or reduce the indebtedness and in April, 1936, filed a debt adjustment proceedings in the Bankruptcy Court. Their first proposal was not accepted, but the proceedings were continued. In March,

1940, the debtors filed what they designated, "Amended and substituted proposal". This last proposal was accepted by the noteholders and the court approved the plan April 22, 1940. The indebtedness at that time amounted to $362,500 principal and $57,450 interest.

Paragraph numbered II of the proposal is:

"The total indebtedness, principal of $362,500, and one-half of the interest, shall be $391,225, and shall be refinanced for a maximum period of 5 years at 4%. (Original notes bore 6%). The other half of the interest, $28,725, shall be waived by the noteholders".

The proposal provides that after the proposal is accepted by the creditors and approved by the Bankruptcy Court, its material provisions should be included in an indenture to be executed by the parties. This indenture was executed. Each of its paragraphs bears the same number as the corresponding paragraph in the proposal and contains practically the same words.

The indenture:

"Par. II. The new notes aggregating $391,225 have been executed and dated Nov. 1, 1939, bearing interest at 4%, maturing on or before five years after their date."

In Paragraph III(a)(1) the debtors "grant, bargain, sell and convey to T. J. Gay as trustee for the noteholders" the same property which had been included in the original mortgage. This paragraph has the usual granting clause, the usual warranty, relinquishment of dower and waiver of redemption clauses. The defeasance clause is contained in paragraph XV, which will be mentioned hereafter.

"Par. III(a)(2). Debtors have executed and placed in the hands of Commercial National Bank four separate warranty deeds conveying to T. J. Gay, trustee, the lands that are included in the mortgage.

"Par. III(b). If at the end of five years from and after Nov. 1, 1939, the full amount of indebtedness then due shall not have been paid in full, all the said deeds

of conveyance shall be by said escrow agent forthwith delivered to, and they shall be accepted by the said T. J. Gay, trustee, or his successor in trust for and in behalf of each and all of the noteholders and their assigns; and in such case all liability and obligation of each and all of the debtors in respect to the above mentioned indebtedness shall immediately expire and terminate. That is to say, delivery and acceptance of the said deeds shall be full discharge and satisfaction of all obligation and liability of the debtors to the noteholders.

"Par. IV. During the five-year period all of the properties shall remain in the hands of the trustee, who shall manage and supervise them generally and who shall manage and supervise them especially with respect to the obtaining of tenants, the negotiating and executing of leases, the collecting of rentals, the payment of taxes, the procurement of insurance and payment of premiums therefor, the making of repairs and the disbursing of all monies derived from the said properties in accordance with this instrument."

Also in paragraph IV there is a provision requiring the trustee to set up a reserve for "taxes, insurance premiums and regularly recurrent expenses"; and Par. IX requires the trustee to accumulate a reserve of $5,000 for preserving and protecting the property in case of emergency.

"Par. V. Funds remaining in the hands of the trustee after the establishment of these reserves shall be disbursed by him as follows: 1. To payment of interest coupons; 2. The balance of funds in the trustee's hands at the end of each six months period shall be employed in the purchase of notes by the trustee. All such purchases shall be made upon tenders."

Paragraph VI provides for release of each of the various parcels of real property if the debtors sell them at certain specified prices.

Paragraph VII authorizes the trustee to sell any or all of the various parcels of property at not less than certain specified prices, $300,000 for one, $85,000 for

another, $85,000 for another, and $40,000 for another. If the trustee could have sold for these prices he would have realized $118,775 more than the mortgage debt.

"Par. XII. It is the intent and purpose of all parties hereto that in the event the debtors shall have failed at the expiration of five years to pay in full all amounts then due, the noteholders may acquire merely upon making demand upon the escrow agent and without the necessity for litigation or other court proceedings of any kind or character whatsoever, good title to all the lands herein above referred to free and clear from all and every right, title, claim and interest of each and all of the debtors and of all other persons who have at any time been obligated upon or in respect of any of the notes.

"Par. XV. If on or before five (5) years from the date hereof all or any of the first parties shall pay or cause to be paid in full the said principal sum of Three Hundred Nine-one Thousand Two Hundred Twenty-five Dollars ($391,225.00), together with all interest, the trustee shall endorse upon the margin of the record a notation stating that said indebtedness has been paid in full and that a lien of this indenture has been fully satisfied and discharged.''

It will be noted that the mortgage which is included in the indenture does not contain the usual power of sale and that the delivery of the deeds was intended to pass the title to the property, thereby doing away with the necessity for foreclosure proceedings. This arrangement was made in the bankruptcy proceedings and was approved by the Bankruptcy Court which had the power to prescribe the manner in which the title should pass.

The trustee took possession of the property, managed it and collected the rents under the agreement. He never solicited tenders. Appellants admit that there were no funds on hand to require a call for tenders until six months before the end of the five-year period, but they say that they think there were sufficient funds six months before the end to justify calling for tenders. How-

ever, the accountant on whom both parties rely, testified that there was not enough in the trustee's hands to justify a call for tenders until the end of the last six months of the five-year period; and we find this to be true.

According to appellants' contention, at the end of the last six months, there was available for the purchase of notes upon tenders, the sum of $25,308.08. Appellees insist that there was only the sum of $16,205.23 on hand at that time. The difference between these two figures is made up of credits for attorneys' fees and taxes claimed by the trustee to which appellants have objected. No part of the principal was paid either by the makers of the notes or the trustee.

The trustee paid all of the interest up to the date of maturity; but he did not deliver to the noteholders or to the Commercial National Bank where the notes were made payable, the balance in his hands at the end of the five-year period or any part of it. Neither did he show on his books that the balance had been credited to the noteholders. But on November 1, 1944, the day after the maturity of the notes, the four deeds were delivered to the trustee by the escrow agent, Commercial National Bank. The notes were delivered up sometime later and the various noteholders, at the time they surrendered their notes, received certificates of interest showing their respective interests in the property which had been conveyed to their trustee. The trustee, T. J. Gay, continued as trustee for those who owned the property, he being the grantee in the deed as trustee for them. He continued to carry the funds which are in dispute in his name as trustee. Later, all of the property was sold in different sales from which the trustee, for the owners, realized the total sum of $340,654. If the amount now in controversy were added to this, the creditors would still lack about $14,000 of collecting their notes.

Appellants filed this suit in the Pulaski Chancery Court in August, 1945, claiming that the debt was satisfied when the trustee took down the deeds; that the surplus money left in the hands of the trustee was the property of appellants, since it had not been applied on

the notes, and they prayed for an accounting and judgment for all surplus moneys in the trustee's hands. Appellants do not challenge the right of the escrow agent to deliver the deeds, or question the title of the grantee.

The Chancery Court, in January, 1947, sustained a motion to dismiss the complaint on the ground that the Bankruptcy Court has exclusive jurisdiction of the matter in controversy. On appeal to this Court, the decree of the Chancery Court was reversed and the cause was remanded for hearing on the merits. 212 Ark. 151, 205 S. W. 2d 24. After hearing the evidence the Chancery Court dismissed the complaint for want of equity and the plaintiffs appealed.

## OTHER FACTS—AND OPINION

The decision of the case turns on the interpretation of the proposal made by the debtors and accepted by the noteholders and the indenture which was executed by the parties to put the proposal into effect.

Appellants submit two propositions:

1. By failing to solicit tenders as required by the mortgage (indenture) the trustee abandoned the only method whereby the surplus funds held by him on November 1, 1949, could become the property of the noteholders; and they, therefore, should be paid to the appellants.

2. Even without the provision for solicitation of tenders, appellants would be entitled to the funds in litigation because the trustee did not apply them to the payment of the notes, and by taking down the deeds the notes were paid, leaving the title to the surplus funds in appellants.

Appellants' first proposition:

Appellees admit that during the five-year period the solicitation of tenders afforded the only way that the surplus funds could be used to reduce the principal; but they insist that the tender provision does not apply to

the funds held by the trustee at the end of the five-year period.

Paragraphs IV of the indenture and IV (a) of the proposal provide, "During the five-year period, all of the properties shall be and remain in the hands of the trustee who shall manage and supervise them generally, and especially with respect to obtaining of tenants, collection of rentals . . . and the disbursing of all monies derived from said properties in accordance with this instrument".

Paragraph V of the indenture (same number in proposal) provides, "The balance of funds in the trustee's hands at the end of each six months period shall be employed in the purchase of notes by the trustee. All such purchases shall be made upon tenders."

All of the provisions of paragraph V relate to disbursements which are authorized and limited to the five-year period by paragraph IV.

Paragraph II of the proposal states that the indebtedness "Shall be refinanced for a maximum period of five years".

Paragraph III (b) of the indenture (same number in proposal) provides, "If, at the end of five years from and after November 1, 1939, the full amount of indebtedness then due shall not have been paid in full, all of the said deeds shall be by said escrow agent forthwith delivered to and accepted by the trustee . . . and in such case, all liability and obligation of the debtors . . . shall immediately expire and terminate".

Appellants concede that calling for tenders would have continued the trust arrangement beyond the end of the five-year period. As authority for such extension of time, they rely on the following language in paragraph XII of the proposal and indenture: "In the event that the debtors shall have failed at the expiration of five years to pay the full amounts then due, the noteholders may acquire merely by making demand on the escrow agent . . . good title to all of the lands". Appellants

construe this language to mean that the noteholders had the right to demand the delivery of the deeds on or after November 1, 1944, but appellants say that the noteholders should have delayed their demand long enough to enable them to take the steps necessary through solicitation of tenders to enforce their rights in respect to the net income held by the trustee on the day the notes matured. The parties, for several years before the substituted proposal was accepted, had been trying to work themselves out of their financial difficulties by agreeing on some equitable plan by which the noteholders could collect their notes and the debtors could pay them. The first plan was offered in April, 1936, and, as appellants say, "After the debtors and creditors skirmished, advanced and withdrew in the Bankruptcy Court over a period of years, they reached an agreement satisfactory to all". We hold that, according to the clear meaning of the language of this agreement supported by the circumstances of the case, the trust was to end on November 1, 1944, and that nothing remained to be done after the five-year period, except the closing of the trust by application of the security. As we construe the language quoted from Paragraph XII, it does not require demand by the note holders before the escrow agent must deliver the deeds. It is clear that the parties intended that the trust should terminate five years after the date of the notes if it had not come to an end by payment of the notes before that time. After default in payment of the notes it was the duty of the escrow agent to deliver the deeds upon demand of the trustee and proof that a balance was due to the note holders after all proper credits.

Appellants call special attention to the fact that the agreement does not in express terms state what must be done with the funds on hand at the end of the trust and argue that this fact indicates that it was the intention to use it in the purchase of notes under the terms of the tender clause and in no other way. It is true that the surplus on hand November 1, 1944, is not expressly mentioned; but in this connection it should be noted that the only disbursements authorized by the express words of

the agreement are those which had to be made before the notes were in default. The only act expressly provided for after default was the delivery of the deeds by the escrow agent to the trustee as the final act of the arrangement. Since one of the main purposes of the plan was to reduce the debt by application of rents, it would appear on the first glance at the agreement that some express provision should have been made for application during the time before maturity of all funds collected during the five-year period; but there were some difficulties in the way of the application of these funds on hand on the date of maturity. It would have been difficult for the trustee to calculate before the end of the five-year period the expenses which would have to be paid out of these moneys and he could not calculate immediately what he would receive from tenants whose rentals were on a percentage basis. For these reasons the parties probably chose to treat the surplus at maturity merely as a part of the security; and the usual and customary way of handling cash security is to apply it on the debt after default, before appropriating the real property.

As we interpret the agreement, the trustee was bound to strike a balance at the end of the five-year period and if, after crediting the debt with all net income from sales of property and from rents, nothing was "then due", it was his duty to mark on the margin of the record of the mortgage "a statement that the debt had been paid in full", as required by paragraph XV. On the other hand, if after giving all proper credits there was "then due" a balance in favor of the noteholders, the escrow agent was required by the terms of paragraph III to "forthwith deliver the deeds to the grantee named therein".

The language used in paragraph XII was merely to emphasize the intention shown throughout the plan that the property was to belong to the noteholders at the end of the five-year period, if the debt was not paid by that time, and that they would not have to go to court to get it.

The plan required the balance of funds at the end of each six months period "during the five-year period" to be used in making purchases of notes after the solicitation of tenders and required the trustee to give notice to the noteholders of the amount on hand for such purchases. It is obvious that these things could not be done with the funds held at the end of the last six months period "during the five-year period" as required by paragraph IV of the indenture. Since the funds in litigation could not have been applied to the purchase of notes under the tender plan without extending the trust beyond the five-year period in violation of paragraph IV of the indenture, and upsetting the five-year plan, we hold that the tender clause does not apply to them.

The Bankruptcy Court seems to have held the same opinion, as shown by its findings: "The court doth find that it is the intent of all of the debtors and all of the creditors that the said arrangement shall, in the event of default of the debtors in the performance of any of the requirements imposed on them (one of which was payment of the notes in five years), make wholly unnecessary the resort to court by the creditors, whether by foreclosure or any other form of procedure whatever for the purpose of investing in the person named by them as grantee in the deeds full, complete, indefeasible and fee simple title". Language of the same import and in some parts identical as used at seven or eight different places in the proceedings as if to emphasize by much repetition that the parties intended that the noteholders should own the property if their notes remained unpaid at the end of the five-year trust.

Appellants' second point:

Since neither the proposal nor the indenture makes specific mention of the surplus funds on hand at the time the notes mature, the disposition to be made of them must be controlled by the intention of the parties as shown by the whole agreement and the circumstances under which it was made. *Bennett Lumber Co.* v. *Walnut Lake Cypress Co.,* 105 Ark. 421, 151 S. W. 275; *Love* v.

*Couch,* 181 Ark. 994, 28 S. W. 2d 1067; *Scrinopskie* v. *Meidert,* 213 Ark. 336, 210 S. W. 2d 281.

As was said by this Court in *Bennett Lumber Co.* v. *Walnut Lake Cypress Co., supra,* "The purpose of all interpretation is to ascertain and give effect to the intention of the parties to the contract as expressed in their writing, and in doing this it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into consideration, the words used would be commonly understood".

In the instant case, the debtors and creditors had been trying to get together on a plan which would enable the debtors to pay and to the creditors to collect their notes. As stated by appellants in their brief, "On April 6, 1936, the Fulks, in a desperate effort to work out an equitable settlement with their noteholders, filed a debt adjustment proceeding in the Bankruptcy Court". By that procedure they hoped to pay their debt and save at least a part of their mortgaged property. If the several properties could have been sold for the selling prices set up in the indenture they would have saved themselves under the plan $118,775 in addition to what the trustee could save during the period of the trust to apply on the debt out of the rents. All parties agreed that the application of the rents to the debt formed a vital part of their plan. No doubt the noteholders would not have accepted the proposal of the debtors if it had not required the rents to be appropriated for payment of the debt. The debtors in the mortgage which was included in the indenture granted, bargained and sold to the trustee for the noteholders the title to the property as security for the debt and placed the trustee in control and management of it for the express purpose of applying the net rents to the debt. The tender clause does not apply to the monies on hand at the end of the trust, but the rents were part of the security. The lien of the mortgage covered them. *Denham* v. *Lack,* 200 Ark. 455, 139 S. W. 2d 243; *Cantley* v. *Turner,* 191 Ark. 607, 87 S. W. 2d 42. There is nothing in the agreement to indicate that

the surplus at the end of the trust is not to be applied to the satisfaction of the debt, or that any error of judgment on the part of the trustee could cause the noteholders to lose this valuable security.

Appellants rely on the law applicable to mortgagees in possession and say: "Even in the absence of the tender solicitation provision, and relying solely on the law applicable to a mortgagee in possession, we could contend that, the mortgage debt having been cancelled by the delivery of the escrowed deeds before the accumulated rents became the property of the noteholders through their application on the debt, such funds now belong to the Fulks". In their argument they recognize the principle of law that a mortgagee or his trustee in possession owes the mortgagor the duty of accounting for the rents, but they say that it takes an application of the rents upon the debt to transfer the ownership from the mortgagor to the mortgagee, and cite: *Integrity Trust Co.* v. *St. Rita Building & Loan Association,* 112 Pa. Supr. Ct. 343, 171 Atl. 283; Jones on Mortgages, Vol. 2, § 1115 (5th Ed.).

The facts in the instant case distinguish it from those included in appellants' citations and appellants' citations are not applicable. The principle which should be applied here is set out in *Greer* v. *Turner,* 47 Ark. 17, 14 S. W. 383. In that case, the creditors held a mortgage on the debtors' crop and the point at issue was whether the proceeds of 41 bales of cotton which had been delivered to them as a part of the crop had been applied on the debt. This Court, after referring to the evidence on the question, said: "But we are not left to depend on the uncertain and fallible memories of witnesses deposing as to transactions which have almost faded from their minds. On the 4th day of November, 1873, Watkins executed to Greer & Baucum a mortgage on this identical crop of 1873. It conveys to them the whole of the crop to secure his indebtedness to them. Here was a specific appropriation, setting apart and designation by act of the parties. It was not necessary for Greer & Baucum to proclaim from the housetop, as each bale of cotton

was sold in the market, that they had applied the proceeds to Watkins' mortgage or to do any act in order to fix their rights. The law would compel their application to the purposes that the parties had destined them by their solemn agreement, and neither party could have changed the appropriation without the consent of the other.''

That all of the net rents were destined to be applied to the debt in the instant case no one denies. The only point raised is that they were not applied before the deeds were delivered by the escrow agent. We hold that the trustee was bound to apply the rents to the debt before taking down the deeds. When the parties agreed that, ''If, at the end of five years the amount then due shall not have been paid in full,'' the deeds shall be delivered in full satisfaction of the obligation, they meant the amount remaining after all monies received on sale of property and the net rents had been applied on the debt. They meant that the plan would work both ways, whether the obligation was satisfied by payment of money or by delivery of the deeds, the amount to be satisfied was the balance after all proper credits. The result would be the same whether the surplus that is in litigation be treated as funds which should have been applied to reduce the debt before default or merely as security to be applied after default. We will apply the equitable doctrine that equity treats that as done which should have been done. Suppose, for example, that the trustee had sold the lot on which the sale price was set at $300,000 and also sold one of the $85,000 lots. By these sales the debt would have been reduced to about $6,000 and he would have had more than enough on hand to pay the balance. In that case, no one could successfully contend that it was not incumbent on the trustee to apply the surplus rents to the satisfaction of the debt and pay the balance to appellants. Whether the amount to be applied wiped out the debt or left a large balance due to the noteholders, it was the duty of the trustee to apply it before taking the deeds in satisfaction of the obligations.

It was the duty of the bank which served as escrow agent to demand of the trustee, before delivering the deeds, some sort of a statement proving that the debt had not been paid after application of all proper credits. Possession of the deeds by the trustee to whom the property was conveyed is *prima facie* evidence that a statement was made which was sufficient to convince the escrow agent that the debt had not been paid. Since the trustee was not required to follow any particular form in making application of the moneys in his hands a simple credit on the account in his statement to the escrow agent would suffice. As has been stated, on the day the deeds were delivered to him, November 1, 1944, the trustee may not have been able to show the exact amount of rents to be credited on the debt, but he could have shown the approximate amount. Since the debt was at that time $391,225 and the amount in the trustee's hands to be applied on it was, according to appellant's figures, about $25,000, and according to appellee's calculations, about $14,000, the statement which was made must have sufficed to show that a large balance was still due to appellees. No one has accused the trustee or the escrow agent of acting in bad faith. The appellants do not say that they have suffered any injury by premature delivery of the deeds. As previously mentioned all of the property was sold by the trustee after he received the deeds and the amount which was received for the property has been paid to the creditors. After the full amount here in question is also credited on the account the appellees will still lack about $14,000 of collecting their debt.

Appellees insist that the debtors in the instant case had nothing more than a right of redemption and could make no claim to any of the surplus on hand November 1, 1944, unless they redeemed. They say the case is controlled by *Danenhauer* v. *Dawson*, 65 Ark. 129, 46 S. W. 131, 44 L. R. A. 193, in which the Court held that one who purchased land at a sale made under the power in a mortgage and went into possession had a right to keep the rents during the period of redemption and that the mortgagor,

unless he redeemed the land, had no right to make the purchaser account for the rents. Mr. Justice HOLT agrees with appellees.

Since, under the opinion of the Court, the appellants have no interest in the funds that are in controversy, we have not considered the objections made by the appellants to the credits which were claimed by the trustee.

The decree of the Chancery Court is correct and it is affirmed.

Justices MINOR W. MILLWEE, ROBERT A. LEFLAR and Special Justice FRED M. PICKENS, dissent.

Justices GEORGE ROSE SMITH and EDWIN E. DUNAWAY, disqualified and not participating.

FRED M. PICKENS, Special Judge, dissenting. Unable to concur in the decision reached by the majority of this court, and without unduly extending the record, I would like to present the minority's views.

We agree with the majority that this decision turns upon an interpretation of the trust indenture, the Federal Bankruptcy Court Order, and the Proposal (referred to as the "Amendment and Substituted Proposal") since all are integral parts of the same agreement and transaction even though executed at different times. We, too, think the purposes and intention of the parties can be discovered from the series of instruments as a whole, for, as the majority state, there was no express provision as to what was to become of the fund now in litigation at the end of the five-year period.

Referring to the pertinent sections or Paragraphs of the Indenture and Proposal for brevity's sake we construe Par. III (b) of the Indenture and Proposal, Par. XII of the Indenture and Proposal and Par. V of the Indenture and Proposal in the light of all other circumstances and verbiage somewhat differently.

Par. V relates to the disposition of any balance of funds on hand at the end of every six months period. This was to enable the Fulks, the mortgagors, to reduce their

debt—which was for the mortgagors' benefit—and thus it must have certainly been contemplated by all parties at the time of execution that the balances would accrue to the mortgagors' benefit—as well as to that of the noteholders.

Some of the majority feel the law of a mortgagee in possession is controlling and cite *Denham* v. *Lack,* 200 Ark. 445, 139 S. W. 2d 243, and *Cantley* v. *Turner,* 191 Ark. 607, 87 S. W. 2d 642. We do not believe this decision can properly be governed by those cases which are still good law. As we view it, the law of a mortgagee in possession is applicable when there is no controlling agreement between the parties. Here, the agreement and the acts performed under the agreement do away with the applicability of the pronouncements in the above decisions. On November 1, 1944, when the deeds were ''taken down'' by the Trustee, the noteholders received an absolute title to the land in full and complete satisfaction of the debt. Prior to that date, the law governing a mortgagee in possession might have controlled—on that date, after receipt of the deeds by the Trustee, this law no longer controlled, for the deeds had been taken from escrow. As a matter of fact the agreement itself provided that if taking down the deeds were necessary the law of a mortgagee in possession should no longer apply (Par. XII of the Indenture and Proposal). The agreement was, as we see it, that from the time the deeds were taken from the escrow agent, the land belonged absolutely to the noteholders in satisfaction of the debt, and that at that time the previous mortgage character of the transaction ended. Thus, foreclosure process, redemption, or any other process whereby the debtors might claim to have the lands sold and the excess turned back to them was excluded. The question of whether or not parties can contractually circumvent the normal mortgage foreclosure and redemption processes under the Arkansas law is not before this court for consideration, for we believe that all parties being properly before the Federal Court, all parties entering into the judicial proceeding in that Court whereby proposal was finally accepted and the Federal Court Order signed by Judge Thomas C. Trimble formally approving the proposal and the creditors' agreement, and the execution of the inden-

ture in faithful compliance with that Federal Court Order exclude that question.

We think that Pars. III (b) and XII provide that the noteholders were to receive absolute title to the land on November 1, 1944, unless the debt were satisfied prior thereto—that the noteholders did so receive that absolute title, extinguishing the debt prior to the application of the funds in litigation here towards the debt.

The majority draw the conclusion that the Trustee must have credited the balance to the noteholders in some manner, otherwise the Bank would not have delivered the deeds held in escrow to the Trustee—assuming without deciding this be pertinent, that conclusion is not substantiated by the record. The records show that the funds were not applied toward satisfaction of the notes prior to extinguishment—we think that would cut off the rights of the noteholders in this fund, and arguments contending that the so-called tender provisions do not apply to the funds held by the Trustee at the end of the five-year period fails, in our opinion, to take into consideration the entire transaction and we believe that Par. V of the Indenture and Proposal referred to each and every six-months period during the trust—not just the first nine six-months periods.

The noteholders had the right to demand delivery of the deeds placed in escrow—this they did—on November 1, 1944—thus, upon the exercise of that right the liability and obligation of the debtors was extinguished as provided by Par. XII, and as there was no provision for the disposition of the balance on hand held by the Trustee, we think the noteholders lost any right they might have had upon delivery of deeds to the Trustee.

The majority emphasize the repetitive feature of several clauses in the Indenture and Proposal relative to the noteholders owning the property if their notes remained unpaid at the end of the five-year trust. Assuming repetition strengthens their conclusion, we find that the notes did not remain unpaid at the end of the five-year trust (the question of who is the loser financially being imma-

terial, as we see it)—on the contrary by the express provision throughout the Indenture and Proposal—the notes were to be paid by delivery of the deeds.

Simply because there is nothing in the agreement indicating that the surplus at the end of the trust was not to be applied to the satisfaction of the debt is not sufficient reason, in the minority's view, to rationalize negatively that it was solely for the benefit of the noteholders. The case of *Greer* v. *Turner,* 47 Ark. 17, 14 S. W. 383, and the case of *Danehauer* v. *Dawson,* 65 Ark. 129, 46 S. W. 131, 44 L. R. A. 193, have no application here, in our opinion. We believe the cause should be reversed in accordance with our interpretation of the entire transaction between these parties and that this fund now in the hands of the Trustee should be paid to the Fulks. I am authorized to state that Justices MILLWEE and LEFLAR join with me in the above opinion.