## LES-BIL, Inc. *v.* GENERAL WATERWORKS CORPORATION

74-39                                    511 S.W. 2d 166

Opinion delivered July 8, 1974

*Brockman, Brockman & Gunti,* by: *E. W. Brockman, Jr.,* for appellant.

*Bridges, Young, Matthews & Davis,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellant seeks reversal of an adverse decree in a suit by appellant seeking an accounting for funds allegedly due it under the refund provisions of a water main construction contract entered into by appellant and Pine Bluff Water Co., Inc., to which appellee is the successor. The only question on appeal is whether the chancellor erred in his construction of paragraphs (4) and (5) of the contract.

Les-Bil, Inc. is a corporation organized to develop the Friendswood Addition in Pine Bluff. In order to obtain water service for the subdivision, appellant, in 1957, contracted with the Pine Bluff Water Co. to pay the actual costs incurred by the water company in extending an existing 10-inch water main from 36th Avenue and Olive Street southward along Olive to Friendswood Drive which is located south of 46th Avenue and Olive. A refund provision provided a formula whereby appellant could recover up to the full amount of the expenditure. The contract contained an estimated cost figure of $19,500 but the actual cost paid by Les-Bil was $16,905. At the time of the filing of this action, appellant had received less than $1,600 in refunds.

The sections of the contract pertinent to this appeal are as follows:

(4) Said actual cost will be refunded by First Party, its

successors or assigns, to Second Party, its successors or assigns, on the basis of twenty-five per cent (25%) of the annual gross revenues received from water consumers located adjacent to and receiving water service from said 10 inch water main referred to herein. First Party agrees to refund twenty-five per cent (25%) of said gross revenues for a period of fifteen (15) years, but no refunds will be made after said fifteen (15) year period. In the event the actual cost referred to herein is entirely refunded on the basis of twenty-five (25%) of the annual gross revenues before the fifteen (15) year period has expired, then, in that event no further refunds will be made.

(5) In consideration of the above mentioned contribution First Party agrees to install, operate, and maintain the water mains above mentioned. The water mains and facilities which First Party agrees to construct shall be its separate property and shall be owned, maintained, and operated by it. First Party reserves the right to make extensions from said water mains to serve other customers, and in serving other customers from said extension no part of the income received from these customers is subject to the refund set forth in Paragraph (4).

Since 1957 two housing developments, Westridge Condominium and Greenbriar Condominium, have been erected on two parcels of real estate which border the west side of Olive Street and extend westward between 41st and 46th Avenues. Each of these complexes consists of a number of condominium units under one roof. Water service to Greenbriar is provided by a 6-inch line which runs from the Olive Street 10-inch main to the complex with each individual unit being connected to the 6-inch line by service lines.[1] A similar situation exists at Westridge where a 3-inch line and a 6-inch line, each running from the Olive Street main, bring water to the complex, with service lines to each condominium. The appellee took the position that service to these complexes was provided from an extension, and, in reliance upon paragraph

[1]George Flegal, Jr. testified that a service lateral or line is intended to serve an individual property.

(5), did not pay any refunds to appellant from the revenues collected for furnishing water to these developments.

Appellant contends that these two developments are ". . . . adjacent to and receiving water service from said 10-inch main. . . . " and therefore it is entitled to refunds based on water furnished to all units of both complexes. It also alleges that "extension" as used in this contract refers only to an additional lengthening of the 10-inch main on Olive Street and that only a strained construction of "extension" could allow appellee to escape the payment of any refunds since no water actually flows from the 10-inch line directly into the homes of the consumers, but rather all users are connected to the 10-inch line by smaller lines. Appellant states that the meaning ascribed to the word "extension" is determinative of the issue in this case.

The chancellor, in a well-reasoned opinion, ruled that the term "extension" as used in the water service industry meant a distribution or transmission main intended to distribute water throughout an area as distinguished from distribution of water to a single customer by use of a service line. He also found that the parties intended that the revenue collected from any water consumer abutting on Olive Street be subject to the refund provision of paragraph (4) since such property could be served by service lines coming directly from the 10-inch main on Olive. Based on these findings he ordered appellee to pay refunds only on water provided to units number 1, 21, and 22 in Westridge and 408 West 41st and 513 Greenbriar, each of which had an exterior wall abutting Olive with no other unit between the wall and the street.

Appellant contends there was no evidentiary support for this construction of "extension"; that doubtful language of a contract should be most strongly construed against the drafter, appellee; and that even if "extension" did have a technical meaning, Dr. Bill Owen, who signed the contract, as President and one of two principal stockholders in Les-Bil, was not conversant with the language of the water industry and would therefore not have known the term had such a meaning.

Appellant admits that the definition relied upon by it is

not the only one accorded to the word in dictionaries but argues that the most common use of the word is in the sense of an elongation or lengthening. Yet, we find that the word, in common parlance, has other definitions which include:

> Any part added to or extended from a main structure to form an addition; prolongation; *an extension to a hospital.* The American Heritage Dictionary of the English language.

> A part that is extended from or attached to a main body or section as a supplement or enlargement. Webster's Third New International Dictionary.

> A part constituting an addition or enlargement, as an annex. Webster's New International Dictionary. 2d Ed.

Our cases clearly recognize that when a technical term is used in a sense other than the ordinary meaning of the word testimony is admissible to explain the meaning of the term and the question may be submitted to the trier of fact to determine in what sense the term was used. *Paepcke-Leicht Lbr. Co.* v. *Talley,* 106 Ark. 400, 153 S.W. 833; *Wilkes* v. *Stacy,* 113 Ark. 556, 169 S.W. 796. See also 17 Am. Jur. 2d 643, Contracts § 251.

Evidentiary support for the chancellor's determination of the meaning of "extension" was provided by the testimony of George Flegal, Vice President and Division Manager of appellee, who testified that the term as used in the water service industry referred to a main intended to either transmit or distribute water throughout an area. Furthermore, as pointed out by the chancellor in his opinion, "extension" or "extend" was used five times in the contract. Both "extend" and "extension" appear in the contract in provisions preceding paragraph 5 and in each instance pertain to main distribution lines rather than individual service lines. There was no testimony that any other meaning of "extension" was contemplated by the two stockholders of Les-Bil who negotiated the contract.

Appellant correctly states our rule that any doubt as to

the meaning of language used in a contract will be resolved against the drafter. However the rule does not necessarily govern in this case. In determining the intention of the parties at least equal regard must be given to the rule that, in spite of the fact that words in a contract are generally to be given their usual and ordinary meaning, words of art or words connected with or peculiar to a particular trade, profession or occupation are to be given the signification attached to them by experts in such art or trade, profession or occupation unless it appears that they were used in a different sense. If, in reference to the subject matter of a contract, words have, through usage acquired a meaning different from their usual and ordinary meaning, the parties must be taken to have used them in their peculiar meaning. *Wilkes* v. *Stacy*, 113 Ark. 556, 169 S.W. 796; *Paepke-Leicht Lbr. Co.* v. *Talley*, 106 Ark. 400, 153 S.W. 833; 17 Am. Jur. 2d 643, Contracts § 251. The dominant rule is that interpretation of a contract is controlled by the intention of the parties. *Asimos* v. *T. L. Reynolds & Son, Inc.*, 244 Ark. 1042, 429 S.W. 2d 103; *Schnitt* v. *McKellar*, 244 Ark. 377, 427 S.W. 2d 202; *Fulk* v. *Gay*, 216 Ark. 462, 226 S.W. 2d 69; *Sternberg* v. *Snow King Baking Powder Co., Inc.*, 186 Ark. 1161, 57 S.W. 2d 1057; *Sydeman Bros. Inc.* v. *Whitlow*, 186 Ark. 937, 56 S.W. 2d 1020. It is the duty of the courts to ascertain and give effect to the meaning and intent of the parties as expressed in the language used. *Fulk* v. *Gay*, supra; *Texas Co.* v. *Kennedy*, 190 Ark. 1178, 78 S.W. 2d 825; *Alf Bennett Lumber Co.* v. *Walnut Lake Cypress Co.*, 105 Ark. 421, 151 S.W. 275. See also *Love* v. *Couch*, 181 Ark. 994, 28 S.W. 2d 1067. The sense in which the words used would naturally be understood, taking into consideration the circumstances surrounding the making of the contract and the situation and relation of the parties, is one of the most important factors to be weighed in making that determination. *Scrinopskie* v. *Meidert*, 213 Ark. 336, 210 S.W. 2d 281; *Hastings Industrial Co.* v. *Copeland*, 114 Ark. 415, 169 S.W. 1185. See also, *Sternberg* v. *Snow King Baking Powder Co., Inc.*, supra. It may be fairly assumed that the parties used their words and understood them in that sense. *Alf Bennett Lumber Co.* v. *Walnut Lake Cypress Co.*, supra. Evidence which tends to show the intention of the parties but does not contradict or vary the tersm of the contract is admissible for the purpose of showing the real meaning of the words and the intention of the parties.

*Sternberg* v. *Snow King Baking Powder Co.,* supra. There is no evidence that the term as used in the water service industry has any meaning other than that given in the testimony of Flegal. Thus, we cannot say that the chancellor's interpretation of the contract was clearly against the preponderance of the evidence.

In answer to appellant's contention that, because of his inexperience in this field, Dr. Owen should not be held to know the meaning of technical terms, it should be noted that he testified he had been involved in business ventures before although this was the first land development enterprise in which he had engaged. The other principal stockholder in Les-Bil, Leslie McIntyre, was a building contractor. On cross-examination Dr. Owen was asked whether McIntyre aided in the contract negotiation. Dr. Owen responded that he had done the majority of the negotiating himself. We may thus infer that McIntyre, a professional in the construction trade, aided in the proceedings. Dr. Owen also admitted that, although he could not remember having done so in this case, he normally consulted with his attorney prior to entering into any business agreements.

We conclude that Dr. Owen knew or should have known that "extension" had a particular meaning in the water service industry. At least, we cannot say that his inexperience compelled the chancellor to disregard the presumption that the word "extension" was used in the peculiar sense of the water industry.

The decree is affirmed.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting. The results in this case remind me of the man that couldn't see the forest for the trees. It's true that the appellee occasionally uses six-inch lines for extension purposes, but it is somewhat syllogistic to say that all six-inch water lines constitute an extension to the water service area. In my view the lines run to the condominiums here are nothing more nor less than service lines to furnish water in sufficient quantity to meet the anticipated demands of the occupants. Since the water service was already available to the area in question, I'm unable to com-

prehend how the six-inch lines to the condominiums amounted to a supplement, enlargement or extension of the ten-inch water service. After all it was the intensity of the use of the area that created the demand for the six-inch line and not the area to be served.

For the reasons stated, I respectfully dissent.