**GENERAL FINANCE CORPORATION, Bankrupt,**

**By Ronald W. Wright, Trustee, Appellant,**

v.

**The FIDELITY AND CASUALTY COMPANY OF NEW YORK, Appellee.**

**No. 20331.**

United States Court of Appeals, Eighth Circuit.

March 25, 1971.

Rehearing Denied April 14, 1971.

Gale B. Braithwaite, Braithwaite, Cadwell & Braithwaite, Sioux Falls, S. D., Delvin N. J. Welter, Yankton, S. D., for appellant.

Robert C. Heege, Davenport, Evans, Hurwitz & Smith, Soux Falls, S. D., for appellee.

Before MATTHES, Chief Judge, CLARK, Associate Justice *, and BRIGHT, Circuit Judge.

CLARK, Associate Justice:

Appellant, Ronald W. Wright, trustee of General Finance Corporation [GFC] a bankrupt, brought this suit in a state court in South Dakota, which was removed to the United States District Court of South Dakota on grounds of diversity of citizenship, to recover on a fidelity bond issued to GFC by The Fidelity and Casualty Company of New York, appellee. Under the terms of the bond, appellee undertook to insure GFC against any loss of money or other property, real and personal, through any "fraudulent or dishonest" act or acts committed by one or more of GFC's employees, whether acting alone or in collusion with others during the term of the bond. The maximum liability of appellee under the obligation was $100,000 per employee and $50,000 excess coverage on an aggregate basis. The Trustee claims that Fred H. Leach, the president of GFC prior to the bankruptcy, through a series of illegal inter-corporate transactions, the making of cash advances to himself and others from GFC funds, the payment of illegal stock, dividends and other manipulations, misappropriated funds of GFC in an amount far in excess of the penalty of the bond. However, the District Court found that Leach was not an "employee" under the terms of the bond; and, even assuming that he was, that the evidence was not clear and convincing that the acts complained of were fraudulent and dishonest but could well have been merely the result of bona fide business transactions. 311 F.Supp. 353. We disagree, reverse and enter judgment for appellant in the maximum penalty of the bond, $150,000.-00.

## 1. Background of the Litigation

Fred H. Leach was a citizen of Yankton, South Dakota, where he had been in business for many years. He had built up a small insurance, credit finance and town-development empire in Yankton, the nucleus of which were six corporations: GFC, Creditors Investors Corporation, Dakota Underwriters, Inc., Fred H. Leach Agency, Yankton Development Company and Fort Dakota Inc. Dakota Underwriters, Inc. acted as manager and underwriter for several insurance companies, one of which was Dakota Mutual Insurance Company. The Fred H. Leach Agency was a general insurance broker and wrote the bond involved here. Both GFC and Creditors Investors Corporation were finance concerns, the former dealing in relatively large loans while the latter handled GFC commercial paper, collateral, open accounts, and small loans which it sold to Security Investment Company of St. Louis. Yankton Development Company was engaged in the development of properties around Yankton, while Fort Dakota, Inc. was a tourist attraction at Lewis and Clark Lake. Mr. Leach was the president of each of the corporations and was a director and stockholder in each of them as well. The stock of the companies was closely held; however, Mr. Leach and his wife owned a majority of the stock in only one, General Finance. The directors varied but those of GFC and Creditors Investors Corporation were practically identical.

The bond in controversy was originally issued in 1948 and at the relevant time here undertook to indemnify GFC for all loss sustained through "any' fraudulent or dishonest act or acts committed anywhere by any of [its] Employees" acting alone or in collusion with others. The assured varied from time to time as did the penal sum of the board but it is agreed that GFC was protected at all times and that the maximum coverage involved is $150,000.00.

The controversy narrows to two questions i. e. whether Fred H. Leach was an employee of GFC within the

terms of the bond and, if so, if the conduct complained of was fraudulent or dishonest.

## 2. The Provisions of the Bond.

Under the language of the bond itself the term "employees" included "one or more natural persons (except directors or trustees * * * who are also officers or employees" of GFC in some other capacity) while in the "regular service" of GFC in the "ordinary course" of the latter's business and who is compensated by it in wages, salary or commissions and whom GFC "has the right to govern and direct in the performance of such service."

Originally the bond—by endorsement —specifically provided that the term "employees" did not include Fred H. Leach, President, or W. G. Smith, Vice President, and a reduced premium was charged. However, in 1953 Mr. Leach wrote appellee and advised that it was necessary that Fred H. Leach be covered under the bond. The appellee then amended the bond by an endorsement cancelling and terminating the previous specific exclusion of Leach and Smith. It charged an additional premium for the amendment, advised GFC of the new coverage and the latter accepted the same by endorsing and returning a copy thereof.

## 3. The Bond's Coverage of Majority Stockholder Leach.

■ The appellee insists, and the District Court held, that the amendment of the bond merely intended to insure GFC against Leach only if the latter met the definition of "employee" in the bond. We hold that this finding was erroneous. It seems clear that the exception provision was only intended to exclude outside directors or trustees and not those who functioned both as a director and officer. In any event in case of ambiguity we will be guided in interpretation by the conduct of the parties. Huffman v. Shevlin, 76 S.D. 84, 72 N.W.2d 852 (1955). See 17 Am.Jur.2d

Contracts § 274, and cases there cited. In the light of the undisputed facts of the case, it is difficult to see how the appellee can now deny the coverage sought and paid for by GFC. Originally when GFC asked that Leach be excluded from the coverage of the bond, appellee issued an endorsement specifically exempting him from coverage. When GFC asked that the bond be extended to include Leach, the appellee merely cancelled the previous exemption. This clearly indicates to us that the bond *without* a limiting endorsement was intended to cover employees such as Leach.

■ Nor do we believe that the fact that Leach and his wife owned a majority of the stock of GFC avoids liability. If majority stock ownership was thought to pose an unacceptable hazard, the insurer could have inserted a provision in the policy concerning stock ownership. Although the corporations were closely held, each was at all times a separate entity in the eyes of the law. Each of the corporations involved had separate boards of directors, of which Mr. Leach was not the sole member. This case is thus distinguishable from Kerr v. AEtna Casualty & Surety Co., 350 F.2d 146 (C.A.4, 1965). Although Mr. Leach and his wife owned a majority of the stock, the corporation was still subject to the control of the Directors who at all times had the right to govern and direct the exercise of all corporate powers, business and property. See Insurance Company of North America v. Greenberg, 405 F.2d 330 (C.A.10, 1969). Indeed, the law places that duty on directors generally. See S.D.Code of 1939, Title 11, Ch. 11.07, § 11.0705. The fact, if true, that the Directors were generally but a "rubber stamp" is not controlling here. The policy does not require that the board of the assured generally make independent decisions. The issue, under the terms of the policy, is did they have the "right to govern and direct" Leach, and the answer is in the affirmative. See Bank of Willow Lakes v. Syverson, 43 S.D. 295, 178 N.W. 989 (1920).

#### 4. *The Fraudulent or Dishonest acts.*

The appellant alleges some 13 items upon which he bases recovery. The penalty of the bond is only $150,000 so we need not go into each one. The overall scheme according to the appellant is that Mr. Leach raided GFC to aid other corporations in the complex.

(a) *Advances to Dakota Mutual.* As we have noted, two of the corporations in the Leach combine were Dakota Underwriters, Inc. and Dakota Mutual Insurance Company. While we are not advised as to the stockholders lists we note that Mr. Leach was president of both companies and G. F. Halstead was secretary of Dakota Underwriters. Mr. Halstead owned about 2600 shares of stock in Dakota Underwriters, and GFC was a substantial stockholder. Mr. Leach's holdings are not shown. Dakota Mutual was owned by its policy holders; however, under its general agency contract with Dakota Underwriters, the latter agreed to pay all of the operating and administrative expenses of Dakota Mutual. It appears that Dakota Underwriters managed and controlled Dakota Mutual.

During a period of some two years Mr. Halstead would go to Mr. Leach to obtain money to meet the payroll of Dakota Mutual and to pay off claims under its policies. During this period he secured $161,000 from Mr. Leach in the form of checks on GFC. The checks were payable to Dakota Underwriters but were deposited to the credit of Dakota Mutual's account at the bank. The records indicate that the advancements were marked on the books of GFC as unsecured loans. The appellee claims that this loss was due to poor business judgment rather than to acts of fraud or dishonesty. However, the loans or advancements violated the by-laws of GFC requiring the Board of Directors to approve loans in excess of $5,000. Moreover, the action of Mr. Leach in this regard followed a familiar pattern of taking money from GFC to bail out other failing companies. Indeed, the money was advanced when GFC itself was in a deficit condition. Mr. Leach's action in this regard, being fraudulent, was covered by the bond.

(b) *Payment of Dividends.* The appellee admits that it was "improper" for Mr. Leach to pay over $85,000 in dividends at a time when GFC itself was in a deficit position. Dividends are only payable out of net profits or earnings, See 19 Am.Jur.2d Corporations, § 819. Appellee claims however that he was acting as a Director in so doing and his action in this regard was, therefore, not covered under the bond. The record shows that Mr. Leach paid out funds of GFC as dividends for ten consecutive years, from 1955 to 1965, when the company was losing money each year. He and his wife owned a majority of the stock during the entire period. The deficit of GFC varied in amount between $26,216.83 in 1958 to a high of $303,199.56 in 1965. In 1955, when the GFC deficit was $58,262 over $51,000 was paid in dividends. The dividends were paid without authorization of the Board of Directors. The bond specifically provides that Directors are covered when they are also officers of the company. Mr. Leach was president of GFC at all times during the relevant period. Indeed the testimony is that all checks issued on GFC were at the direction of Mr. Leach. He, of course, had no authority to issue the checks as a Director without prior approval of the Board. See Georgia Casualty & Surety v. Seaboard Surety Co., 210 F.Supp. 644 (N.D.Ga., 1962) affirmed, 327 F.2d 666 (C.A.5, 1964); 13 Am.Jur. §§ 865–66; 19 Am.Jur.2d, Corporations, § 836; New York, L. E. & W. R. Co. v. Nickals, 119 U.S. 296, 7 S.Ct. 209, 30 L.Ed. 363 (1886).

(c) *Other transactions.* Appellant cites eleven other items, all of which indicate that over six hundred thousand dollars was drained off GFC and pumped into the other corporations, all without any authorization from the Board of Directors. These included $27,804.69 in checks payable to Mr.

Leach himself; another $18,617.00 to Fort Dakota, Inc. which the evidence shows was for running expenses of the latter. Just as in the case of Dakota Underwriters, the manager of Fort Dakota would come to Mr. Leach for money from time to time and he would have checks issued to Fort Dakota. Likewise Creditors Investors Corporation received cash in the amount of $31,670.55 for advances from time to time. General Finance Corporation also paid $18,500 to Valley State Bank which was credited on notes of Mr. Leach held by the bank; likewise Mr. Leach transferred over $600,000 in commercial paper owned by GFC to the Securities Investment Company of St. Louis as additional security for an old loan by the latter to Creditors Investors Corporation. GFC received nothing for the paper and the balance due thereon is $458,934.49. In view of the limited penalty of the bond we need not pass judgment upon these transactions but recite them only to complete the picture.

We find the minutes and other corporate books of the various corporations incomplete, irregular and spasmodic. While it is true that fraud and dishonesty may never be presumed and left to mere speculation, Continental Casualty Co. v. First Nat'l Bank, 116 F.2d 885 (C.A.5, 1941), cert. denied, 313 U.S. 575, 61 S.Ct. 1087, 85 L.Ed. 1533 (1941), more is not required than that it be established by a fair preponderance of the evidence which, of course, must be clear and convincing. Northwest Realty Co. v. Colling, 82 S.D. 421, 147 N.W.2d 675 (1967); Guaranty State Bank of Osceola v. Potter, 49 S.D. 619, 208 N.W. 170, 172 (1926); Hardware Mutual Ins. Co. of Minn. v. Jacob Hieb, Inc., 146 F.2d 447 (C.A.8, 1945). Fraud may be established by inference from the facts. Funke v. Holland Furnace Co., 78 S.D. 374, 102 N.W.2d 668 (1960). The words "fraudulent or dishonest" are to be given a broad meaning in the context here. Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, 202 F.2d 794 (C.A.7, 1953). Fidelity and Deposit Co. of Mary-

land v. Bates, 76 F.2d 160 (C.A.8, 1935). Although it is not necessary that the employee benefit personally, here the proof traced some funds directly to Mr. Leach, and monies of GFC were diverted again and again to unauthorized purposes in disregard of the interest of the corporation and palpably subjecting it to a likelihood of loss. The records of GFC failed to note any legitimate grounds upon which such diversion of funds were made. Mr. Leach was present during the entire trial, heard the testimony and offered no explanation nor refutation. We hold that the appellant made out a prima facie case under these circumstances and the burden shifted to the appellee to offer its proof in explanation or contradiction. The appellee having failed to do so, the appellant is entitled to recover.

Appellee claims that various minutes of the Board of Directors show that the prior acts of Mr. Leach were ratified subsequently by the Board. All of these actions, however, were of a general nature authorizing all previous acts of Mr. Leach and ratifying the same. Some of the resolutions even ratified future general action yet to be performed. We believe these belated blanket authorizations and approvals were ineffective for several reasons. First, the directors were not advised what acts they were approving and knowledge of the material facts of a transaction is necessary to ratification; next, the minutes were all an *ex post facto* attempt to ratify previous action. As shown by the arrangement of the minute book itself, earlier meetings were reported in the bound and page numbered minute books subsequent to later ones. Finally, void, fraudulent or illegal acts cannot be ratified. See Emerson v. Labor Invest. Corp., 284 F.2d 946 (C.A.10, 1960); 19 Am.Jur.2d § 1251, p. 657.

### 5. Cancellation.

Appellee also asserts that the cancellation provision of the bond prevents recovery. This section of the bond provides that "immediately upon discov-

ery" of a fraudulent act by GFC or by any officer thereof not in collusion, the bond is cancelled. Appellee claims that the acts were done openly, notoriously and without any attempt to hide or secrete them. Each of the officers knew of the acts and some of the employees were in a like position. However the court found that neither the members of the board nor any of the employees of GFC "were aware of the true nature of the events which have given rise to the allegation by the Trustee." We are of the view that this finding is correct and conclude that the bond was not cancelled through the operation of this provision.

The judgment of the District Court is reversed. Judgment for the appellant and against the appellee for the maximum sum of the bond, $150,000, shall be entered and it is so ordered.