448 F.2d 360
 UNITED STATES FIDELITY & GUARANTY COMPANY, Appellant,
v.
EMPIRE STATE BANK, Appellee.
EMPIRE STATE BANK, Cross-Appellant,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, Cross-Appellee.
 Nos. 20579, 20576.
 United States Court of Appeals,
Eighth Circuit.
 Sept. 2, 1971.
 
 Samuel J. Molby, James F. Duncan, Kansas City, Mo., for appellant; Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.
 Bernard L. Balkin, Judith J. Paxton, Kansas City, Mo., for appellee; Achtenberg, Sandler & Balkin, Kansas City, Mo., of counsel.
 Before ALDRICH,* LAY and BRIGHT, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 In this case, Empire State Bank of Kansas City, Missouri (Empire) sought indemnity from its insurer, United States Fidelity & Guaranty Company (U.S.F. & G.), under a Bankers' Blanket Bond which protected against any loss resulting from the dishonesty of any employee, "sustained * * * at any time," and discovered during the policy period. Empire recovered in the district court on two of three claims, and U.S. F. & G. appeals from the judgment allowing that recovery. Empire cross-appeals on the one claim disallowed by the trial court. We affirm the district court judgment, except for its allowance of statutory penalties and certain prejudgment interest.
 
 
 2
 Empire claimed that the dishonesty of its former executive vice president, Ben Leimgruber, caused Empire substantial loss in two unrelated loan transactions. Count I of this action, for $25,776.19 plus interest, is based on Empire's loss on loans made to Briar Associates, a corporation, and to Eddie Robbins, its principal stockholder who co-signed promissory notes representing the indebtedness. Count II, for $96,199.28 plus interest, arises from losses sustained on loans made to Pleasure, Incorporated, and to Lyle McAllister, its principal stockholder. Under Count III, for approximately $26,000 plus interest, Empire sought recovery of expenditures for attorney's fees incurred in successfully defending a third-party action in which the plaintiff alleged damages resulting from fraudulent misrepresentations by Empire's officers, including Leimgruber. Empire also sought recovery of the Missouri statutory penalty for its insurer's vexatious refusal to pay the claims under Counts I and II and its vexatious refusal to defend or indemnify Empire for the expenses incurred in the third-party action under Count III.[1] The district court, in an unreported opinion, allowed plaintiff recovery of $23,391.94 on Count I, denied recovery on Count II, awarded recovery of $11,685 on Count III, and allowed both statutory penalties and prejudgment interest on Counts I and III. The insurer urges that we reverse or reduce the recovery on Count I and disallow any recovery of statutory penalties or prejudgment interest on Count I and Count III. Empire, in its cross-appeal, contends that it is entitled as a matter of law to recover under Count II.
 
 
 3
 We first consider the U.S.F. & G. appeal and turn to a consideration of Count I.
 
 I. DISCOVERY OF LOSS
 
 4
 Empire commenced business as a newly organized bank in February 1963. In November of that year the directors hired Ben Leimgruber, a banker of considerable experience, as executive vice president to supervise banking operations. Leimgruber, during previous employment at the Union National Bank of Kansas City, had worked himself up from assistant auditor to executive vice president, third in the hierarchy of bank officers below the board chairman and president. Leimgruber had also served the United States government as an assistant national bank examiner from 1934 until 1942.
 
 
 5
 Leimgruber remained at Empire until March 1, 1965, when he resigned after shortages were discovered in the installment loan department. The shortages were attributed to dishonest and fraudulent acts committed by the manager of that department who worked under Leimgruber's supervision. There has been no suggestion of complicity by Leimgruber in these defalcations.
 
 
 6
 During the period from November 14, 1964, to November 23, 1964, Briar Associates secured loans from Empire by giving a pledge of the corporation's capital stock. The pledged stock showed a book value of approximately $36,000 representing capitalized expenditures, but the collateral actually possessed no real value as security. With the co-signature of Eddie Robbins, Empire initially loaned Briar Associates the sum of $7,500. Subsequently, the Bank made additional advances until the indebtedness of Briar Associates reached approximately $19,000 at the end of November 1964. On December 1, 1964, the Bank made one additional loan to the corporation of $27,000, securing this loan by a pledge of stock in various publicly-held companies, in the hope of improving the Bank's secured status on the entire account. The Bank advanced an additional $1,250 on December 23, 1964, secured by a mortgage on certain real property in Pawhuska, Oklahoma, in which, as it was later disclosed, the borrower held no title interest. The borrower made no payment on these loans.
 
 
 7
 After Leimgruber resigned in March of 1965, Empire unsuccessfully attempted to collect the Briar Associates account by contacting Eddie Robbins. During these collection efforts, Empire's president learned of the poor credit ratings of both Robbins and Briar Associates. In 1957, Union National, Leimgruber's former employer, had charged off a Robbins loan in the sum of $3,125, and in May of 1964 Union National had charged off a Briar Associates-Eddie Robbins loan in the sum of $6,100. In a conference with Robbins in April 1965, Robbins stated to Empire's president that he had himself loaned money to Leimgruber. In support of this claim, Robbins exhibited facsimilies of two $4,500 notes signed by Leimgruber. In June 1965, after Empire had repossessed an automobile owned by Robbins and held by the Bank as collateral for an installment loan, Robbins protested the Bank's treatment of him as unjustified, claiming to have paid Leimgruber approximately $2,500 as a commission for obtaining credit with Empire.
 
 
 8
 After July 1, 1965, Empire verified that Robbins had in fact wired approximately $2,500 to Leimgruber on December 2, 1964, the day after the Bank had granted Briar Associates the new $27,000 loan. Empire, in September 1965, arranged for an investigator to interview Leimgruber at Phoenix, Arizona, where Leimgruber had moved after leaving the Bank. In that interview, Leimgruber emphatically denied that Robbins had ever loaned him money, denied knowledge concerning Robbins's defaults at Union National, and denied the receipt of any commission or any money from Robbins in connection with any loan transaction. By way of later deposition introduced at trial, however, Leimgruber testified to the contrary. He admitted that Robbins sent him $2,500 on December 2, 1964, but said that this money was held in trust for Robbins. Leimgruber further testified that he had returned this money to Robbins in cash about two months later. Leimgruber also admitted borrowing money from Robbins, but said that this transaction had occurred long before he had accepted employment with Empire. Leimgruber admitted giving Robbins a note representing this loan in the amount of $4,500 and stated that this note had been renewed from time to time. Following default on these loans, the Bank liquidated the collateral and sustained an overall loss of $23,391.94, which loss was made the subject of Count I.
 
 
 9
 As to Count I, the trial court determined: (1) that the actions and conduct of Leimgruber in "recommending [Briar Associates as a] new customer and in making and renewing the loans made [to Briar Associates and Eddie Robbins] were dishonest"; (2) that the loss attributable to depreciation of corporate stocks held by Empire as collateral for the $27,000 loan in December 1964 constituted a recoverable loss flowing from Leimgruber's dishonesty;[2] and (3) that "the dishonesty of Leimgruber was not discovered by the bank until after July 1, 1965, and [that] the loss [was] covered by [the] bond."
 
 
 10
 On this appeal, U.S.F. & G. does not contend that the trial court erred in finding Leimgruber's conduct to be dishonest with regard to the Briar Associates-Eddie Robbins loans. It concedes that this finding rests upon credibility determinations drawn by the district court from disputed testimony. U.S.F. & G. contends, however, that no substantial evidence supports the trial court's finding that the Bank had discovered its loss within the policy period, which commenced at noon on July 1, 1965, and continued until September 22, 1966. Irrespective of this, U.S.F. & G. also contends that the Bank possessed sufficient knowledge of Leimgruber's wrongdoing to require it to disclose its suspicions when it executed its application for bond coverage in June of 1965.
 
 
 11
 On the discovery issue, both parties cite Jefferson Bank & Trust Co. v. Central Surety & Insurance Corp., 408 S.W.2d 825 (Mo.1966), as enunciating the controlling principles of law. In Jefferson, the Missouri Supreme Court adopted the following language taken from Wachovia Bank & Trust Co. v. Manufacturers Casualty Insurance Co., 171 F.Supp. 369 (M.D.N.C.1959):
 
 
 12
 "In order to constitute a 'discovery' in accordance with the terms of the policy * * * there must be facts known, at the time it is asserted that the discovery was made, which would lead a reasonable person to an assumption that a shortage existed. The facts must be viewed as they would have been by a reasonable person at the time discovery is asserted, and not as they later appeared in the light of subsequently acquired knowledge. * * * [T]he mere discovery of certain facts which later lead to other facts which reveal the existence of a shortage does not necessarily constitute a discovery. Knowledge available to the insured must rise above a mere suspicion of loss. The fact that an investigation after the termination of the policy leads to the disclosure of an actual defalcation does not raise a previous suspicion to the leval of a discovery. Inefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as [with] their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist." (emphasis and bracketed word added) [408 S.W.2d at 831, quoting 171 F. Supp. at 375-376]
 
 
 13
 Discovery thus imports an awareness of the significance of known facts. The Missouri Supreme Court particularly noted in Jefferson that "* * * not only must the facts be known, but they also must be recognized for what they are * * *." 408 S.W.2d at 831.
 
 
 14
 Applying this principle in relation to a clause effecting cancellation of a fidelity bond upon an insured discovering an employee's fraud, we recently said in General Finance Corp. v. Fidelity & Casualty Co. of New York, 439 F.2d 981 (8th Cir. 1971):
 
 
 15
 Appellee [bonding company] claims that the [fraudulent] acts [of the employee] were done openly, notoriously and without any attempt to hide or secrete them. Each of the officers knew of the acts and some of the employees were in a like position. However [,] the court found that neither the members of the board nor any of the employees of [the insured] "were aware of the true nature of the events which have given rise to the allegation by the [employer's] Trustee [in Bankruptcy]." We are of the view that this finding is correct and conclude that the bond was not cancelled through the operation of this provision. [439 F.2d at 987]
 
 
 16
 In determining when discovery has taken place, the trier of fact must find the pertinent underlying facts known to the insured and must further determine subjective conclusions reasonably drawn therefrom by the insured. Appellant-insurer argues, and we agree, that Empire knew prior to July 1, 1965, that Briar Associate's loans had been made with inadequate collateral, to a corporation controlled by Robbins, a person having an unsavory personal, and unsatisfactory credit, reputation. Empire also knew prior to July 1, 1965, that Robbins claimed that he had made a "pay-off" to Leimgruber in order to obtain loans from the Bank. It was not until after July 1, 1965, however, that the Bank succeeded in substantiating any part of Robbins's charges through verifying Leimgruber's receipt of a Western Union money order sent by Robbins. Additionally, Leimgruber did not furnish the Bank with his own version of the alleged transaction until September 1965.
 
 
 17
 Bank president Ralph Hipsh testified that the Bank, not wanting to do Leimgruber an injustice, sent its representative, Lem Jones, to Phoenix to get Leimgruber's account of the facts. Significantly, the report that Jones gave Hipsh disclosed the following:
 
 
 18
 "I [Jones] asked Leimgruber if he had ever received any commission or money from Robbins in connection with any of the loan transactions involved. He stated absolutely not. When I advised Leimgruber that Robbins claimed that he had to make loans to Leimgruber in order to get the financing for Briar Associates at the bank, Leimgruber began to lose his composure. He denied emphatically that Robbins had ever loaned him money."
 
 
 19
 ******
 
 
 20
 * * *
 
 
 21
 "I [Jones] questioned Leimgruber regarding his knowledge of Robbins' personal background and the fact that a prior loan at the Union National Bank had been written off as a bad debt. He denied that he had any knowledge of Robbins' background or the status of the Union National Bank loan at the time that he made the loan in question at the prior account."
 
 
 22
 Leimgruber's absolute denials relating to loans and transfers of funds, in light of documentary evidence disclosing information to the contrary, furnished powerful reasons to then doubt his veracity and to appreciate the likelihood of his having dishonestly recommended and encouraged an extension of credit to Briar Associates and Robbins.
 
 
 23
 Suspicion alone does not satisfy the test of discovery. Jefferson Bank & Trust Co., supra. A realization that a highly respected and able bank official has betrayed his trust should and would come hard to those who trusted him. See Aetna Indemnity Co. v. J. R. Crowe Coal & Mining Co., 154 F. 545, 549 (8th Cir.), cert. denied, 207 U.S. 589, 28 S.Ct. 256, 52 L.Ed. 354 (1907); Perpetual Building & Loan Ass'n v. United States Fidelity & Guarantee Co., 118 Iowa 729, 92 N.W. 686, 688 (1902). Within the purview of Jefferson, the district court could find that discovery in this case took place when the Bank, by way of a letter from Western Union, verified that a probable "pay-off" for a loan had been made by Robbins, or even later when it discovered that Leimgruber's verbal statements to an investigator were in conflict with documents earlier presented to the Bank. Given the information known to Empire prior to July 1, 1965, we cannot say that a reasonable man would have necessarily appreciated that he had sustained a loss caused by the dishonesty of a trusted former employee. Under such circumstances, we will not set aside a finding by the trial court that the Bank discovered its loss resulting from Leimgruber's dishonesty after July 1, 1965, during the policy period. See, e. g., General Finance Corp., supra, 439 F.2d 981; Shatz v. American Surety Co. of New York, 295 S.W.2d 809, 816 (Ky.1955); Rule 52(a), Fed.R.Civ.P.
 
 
 24
 We see no merit, moreover, in the defense to Count I that U.S.F. & G. should not be held liable for this loss because Empire failed to disclose suspicions about Leimgruber in its application for bond coverage. The bond application form itself, however, required no disclosure of suspicious circumstances concerning former employees; it required only a certification that "* * * present officers and employees of the Insured * * * have all, to the best of the Insured's knowledge and belief, * * * performed their respective duties honestly." This contention of U.S.F. & G also appears to overlook the circumstance that Empire possessed no apparent motive to falsify its application since another insurer provided coverage for any such loss discovered prior to July 1, 1965. We find no provision of the policy, nor of the application, requiring the Bank to give credence to rumors concerning former employees by reporting them for possible investigation to a prospective insurer. The application form required the applicant Bank to report all losses during the previous five-year period and to disclose pertinent information known to the applicant concerning present employees. In the absence of any showing of bad faith or fraud, however, appellant-insurer makes no case for setting aside coverage on the basis of false representation. See generally, as relates to similar aspects of this type of insurance coverage, Appleman, Insurance Law and Practice Secs. 6195(a), 6197 (1944).
 
 II. REDUCTION OF DAMAGES
 
 25
 In addition to filing claims under Counts I and II with U.S.F. & G., Empire filed identical claims with Hartford Accident & Indemnity Company, which had provided Bankers' Blanket Bond coverage terminating prior to July 1, 1965. Shortly before Empire brought the present lawsuit, however, it settled the claims filed with Hartford for $2,000 and furnished Hartford with a covenant not to sue. Appellant U.S.F. & G. seeks credit for that $2,000 payment against the judgment entered upon Count I. Although Jefferson Bank & Trust Co., supra, 408 S.W.2d at 832, indicates that a bank in the posture of Empire in this case must credit against a fidelity bond claim all sums received from another insurer upon the same loss, we are unable to apply this rule in the instant case for two reasons: (1) this issue was not pleaded to or considered by the district court and cannot be considered de novo on this appeal, United States ex rel. Huisinga v. Commanding Officer, etc., 446 F.2d 124 (8th Cir., June 28, 1971); United States v. 3,788.16 Acres of Land, etc., 439 F.2d 291, 296 (8th Cir. 1971); National Compressor Corp. v. Carrow, 417 F.2d 97, 102-03 (8th Cir. 1969); Skogen v. Dow Chemical Company, 375 F.2d 692, 703 (8th Cir. 1967); and (2) the record appears unclear whether Hartford as the predecessor insurer paid this $2,000 solely upon the Briar Associates-Eddie Robbins transactions, or upon the claim made here under Count II (involving Pleasure, Incorporated-Lyle McAllister) in which plaintiff Empire made no recovery from U.S.F. & G., or upon both claims. See Jefferson Bank & Trust Co., supra, 408 S.W.2d at 832. Both of these circumstances bar us from giving U.S.F. & G. relief.
 
 
 26
 Appellant-insurer, U.S.F. & G., also objects to being charged for any loss attributable to the depreciation of the collateral pledged to the Bank in connection with the December 1964 loan for $27,000. U.S.F. & G. cites no legal authority in support of its contention, and the decision in Maryland Casualty Co. v. American Trust Co., 71 F.2d 137 (5th Cir. 1934), holds to the contrary. Since the employee's dishonest conduct, covered by the bond in the instant case, induced the loans in question, it would seem appropriate that the insurer indemnify the obligee Bank for all losses incident to the loan transaction. Stock held as collateral will fluctuate in value from time to time. The coverage of the bond broadly indemnifies plaintiff Bank from "any loss" sustained in connection with employee dishonesty, and in our judgment provides indemnity for the entire loss attributable to the tainted loan transactions measured in part by the depreciation in the collateral which initially afforded ample security for the $27,000 loan. See American Insurance Co. v. First National Bank in St. Louis, 409 F.2d 1387, 1391 (8th Cir. 1969).
 
 
 27
 We, therefore, affirm the award on Count I subject to the discussion in part IV relating to the award of a statutory penalty and prejudgment interest.
 
 III. CROSS-APPEAL
 
 28
 In denying recovery to the Bank upon Count II for its substantial loss incurred on the Pleasure, Incorporated-Lyle McAllister account, the trial court found that Pleasure, Incorporated loaned Leimgruber $2,500 subsequent to Leimgruber's resignation from the Bank. The trial court specifically held that no dishonesty of Leimgruber can be imputed from this loan. Pleasure, Incorporated made this loan to enable Leimgruber to move his family to another state and to a new job.
 
 
 29
 The trial court, moreover, concluded that "dishonest" acts of Leimgruber did not cause any loss of the Pleasure, Incorporated-Lyle McAllister account, since the Bank continued extending additional credit to this borrower long after Leimgruber's employment had terminated. The trial court noted that the Bank consummated these additional loans with knowledge of the borrower's poor financial status, in reliance upon collateral which Empire then thought adequate. We find substantial evidence in the record to support these findings, and we, therefore, affirm pursuant to Rule 52(a), Fed.R.Civ.P.
 
 IV. STATUTORY PENALTIES
 
 30
 In entering judgment on Counts I and III, the court assessed damages against the insurer as authorized by Missouri statute[3] for vexatious refusal to pay the claims under those two counts. The penalty amount totaled $12,565.59, which included ten percent of the principal recovery on Counts I and III ($3,507.69), plus reimbursement of Empire's attorney's fees in the sum of $9,057.90 on those counts. We reject the assessment of any such penalty. We find the issue of liability in Count I to be an extremely close one, and, as such, one not justifying the imposition of any penalty. Recently, in United States for Use of R. W. Vaught Co. v. F. D. Rich Co., Inc., 439 F.2d 895 (8th Cir. 1971), we reviewed the status of the Missouri law and noted:
 
 
 31
 In order for a plaintiff to recover for vexatious refusal to pay, he must produce evidence which shows that the refusal was wilful and persistent and without reasonable cause as the facts would appear to a reasonable and prudent person before trial. Duckworth [Duckworth v. United States Fidelity & Guaranty Co.], supra, 452 S.W.2d 280, 287 [Mo.App.]; Hughes v. Great American Ins. Co., 427 S.W.2d 266, 271 (Mo.App.1968). * * * Where there is an open question of fact or law determinative of the insured's liability, the insurer, acting in good faith, may insist on judicial determination of such questions without subjecting itself to penalties for vexatious refusal to pay. Cohen v. Metropolitan Life Ins. Co., 444 S.W.2d 498 (Mo.App.1969). [439 F.2d at 905]
 
 
 32
 In light of the foregoing rule, the assessment of a penalty on Count I cannot stand where the record reveals an insurer's apparent good faith defense involving a close question of fact.
 
 
 33
 In Count III, the record establishes that the plaintiff Bank brought suit against U.S.F. & G. for almost $26,000 arising out of litigation expenses incurred in the successful defense of an action which alleged that Empire had fraudulently misrepresented the financial status of Pleasure, Incorporated. The insurer conceded its obligation under the bond to reimburse Empire for the costs of defending this action. The record discloses, however, that Empire's demand upon its insurer for reimbursement included attorney's fees incurred by Empire for legal services other than those in defending the lawsuit in question. The district court determined that plaintiff Empire was entitled to recover the sum of $11,685 on Count III, rather than the $26,000 originally claimed.
 
 
 34
 This demand for attorney's fees, shown to be excessive, serves to bar recovery of any penalty on Count III. The insured should have provided its insurer with an accurate, uninflated statement of attorney's fees due under the bond. When, as here, an insurer is presented with a claim which is unreasonable in amount, he may seek a judicial determination of the entire claim without incurring the statutory penalty for refusing to pay a part thereof. F. D. Rich Co., supra, 439 F.2d at 905; Cohen, supra, 444 S.W.2d at 506.
 
 V. PREJUDGMENT INTEREST
 
 35
 The district court allowed recovery of prejudgment interest on both Counts I and III. U.S.F. & G. contends that a recovery by the plaintiff for an amount less than the amount of the original demand on each count establishes that the plaintiff made claims for unliquidated damages, thus not warranting prejudgment interest. We disagree. Recently, in American Insurance Co., supra, 409 F.2d at 1392, we recognized that successful recovery of liquidated amounts, those in which "the amount due can be readily ascertainable by computation," justify a district court in permitting assessment of interest under Missouri law. See also Eastmount Construction Co. v. Transport Manufacturing & Equipment Co., 301 F.2d 34, 42 (8th Cir. 1962). Since Empire, in Counts I and III, presented claims of loss which could be computed to an exact amount, the district court was authorized in awarding plaintiff interest upon them. As to Count III, however, we note that the trial court allowed interest from the date the attorneys submitted their bill to Empire, rather than the date on which Empire demanded payment from U.S.F. & G. Interest upon a claim against an insurer's contractual obligation runs from the date of the demand made by the insured, unless otherwise specified. See, e. g., Mo.Stat.Ann. Sec. 408.020 (Vernon 1959); Allstate Finance Corp. v. Zimmerman, 296 F.2d 797 (5th Cir. 1961); Weekley v. Wallace, 314 S.W.2d 256 (Mo.App.1958). In the instant case, plaintiff made no demand for reimbursement of this expense until it filed its complaint on November 1, 1967. Accordingly, the prejudgment interest due on Count III should be calculated from that date.
 
 
 36
 We allow Empire to tax sixty-six and two-thirds percent of its costs attributable to defending the appeal, and we allow U.S.F. & G. its costs attributable to defending against the cross-appeal. We remand this case for the entry of judgment consistent with this opinion.
 
 
 
 *
 Of the First Circuit, sitting by designation
 
 
 [1]
 The statute, Mo.Stat.Ann. Sec. 375.420 (Vernon 1959), provides:
 In any action against any insurance company to recover the amount of any * * * fidelity * * * insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount there-of and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.
 
 
 [2]
 The court specifically found that the collateral received by the Bank for this $27,000 loan was adequate, "but that later changes in the market rendered it woefully inadequate."
 
 
 [3]
 See note 1, supra