Ben Fred PERKINS, as Administrator with Will Annexed of the Estate of T. O. Perkins, Deceased, and Mary Perkins, Individually, Appellees,

v.

CLINTON STATE BANK, Appellant,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellee,

G. C. Daugherty Properties, Inc., and G. C. Daugherty, Individually.

No. 78–1083.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1978.

Decided Feb. 27, 1979.

John L. Johnson, Johnson & Lewis, Ltd., Little Rock, Ark., argued, for appellant; Fletcher C. Lewis, Little Rock, Ark., on brief.

Vincent Foster, Jr., Little Rock, Ark., argued and on brief, for appellee Perkins.

Ronald A. May, Wright, Lindsey & Jennings, Little Rock, Ark., argued and on brief, for appellee Fidelity & Deposit Co. of Maryland.

Before VAN OOSTERHOUT,* Senior Circuit Judge, LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

This is an appeal by the Clinton State Bank from a judgment for losses suffered by Mary Perkins and the estate of her deceased husband, T. O. Perkins. The trial court, the Honorable G. Thomas Eisele presiding, found that the defendant G. C. Daugherty fraudulently induced Thomas McKnight, an officer of the Bank, to release escrow documents which the Bank, as escrow agent, held as security for the protection of the Perkins in a complicated land

* The Honorable Martin D. Van Oosterhout participated in the post-argument conference and concurred in the result prior to his death on January 28, 1979.

transaction with Daugherty. The court found the Bank and Daugherty liable for damages suffered by the Perkins. The court further found the Bank's bonding agreement with Fidelity & Deposit Company of Maryland covered the loss sustained, but held that the Bank could not recover from Fidelity since it had failed to comply with the notice provision contained in the agreement.

On appeal the Bank contends the trial court erred in (1) holding the Bank had breached its fiduciary duties as escrow agent; (2) finding a causal relationship between the Bank's actions and the damages awarded; and (3) holding that the Bank failed to give timely notice of loss to Fidelity under the bonding agreement.

*Facts.*

In December of 1972, Mr. G. C. Daugherty, a third-party defendant in this suit, initiated efforts to purchase 800 acres of Arkansas land from Mr. and Mrs. Perkins. The trial court found that Daugherty acted with the specific intent to defraud the Perkins out of 80 per cent of the purchase price. Daugherty and G. C. Daugherty Properties, Inc., an alter ego "shell" corporation wholly owned by Daugherty, entered into an agreement to buy land from the Perkins. Under this agreement Daugherty executed a promissory note which made him personally liable for the purchase price due the Perkins. The debt was further secured by certain property owned by Daugherty in San Antonio, Texas and the 800 acre Arkansas tract. Upon the Perkins' recommendation, the Clinton State Bank was designated as the escrow agent. Pursuant to the escrow[1] and purchase agreements, Daugherty deposited with the Bank, as security for the promissory note, a deed for three acres of the San Antonio land and a quitclaim deed from G. C. Daugherty Properties, Inc. conveying the 800 acre tract back to the Perkins.

In April 1973 Daugherty told Mrs. Perkins that he intended to sell the San Antonio property and apply the proceeds to pay off a large part of the $80,000 note. He further led Mrs. Perkins to believe that in order to complete the sale her signature on an addendum to the escrow agreement was necessary. Daugherty subsequently drafted the addendum,[2] which Mrs. Perkins signed.

---

1. In order to further his scheme to rid himself of personal liability and destroy the effectiveness of the security arrangements regarding the two parcels of land, Daugherty drafted the following escrow agreement provision:

    [P]rovided BUYERS shall have the right to mortgage the above described real estate from and after the closing until January 14, 1974. BUYERS shall have the right to improve, sub-divide, and sell all or any portion of the real estate herein conveyed by SELLERS, but it is understood and agreed that all net proceeds of any such sales shall be paid to the ESCROW AGENT, to be credited by it to the account of SELLERS on the unpaid balance due on the real estate being conveyed, and it is further understood and agreed that BUYERS shall have the right to sell all or any portion of the San Antonio Commercial Property herein conveyed to SELLERS, provided all net proceeds, including promissory notes resulting from such sales, shall likewise be paid to ESCROW AGENT to be credited by it to the account of SELLERS on the unpaid balance due under this Agreement, so long as a balance remains thereon. Any and all such promissory notes shall be assigned by BUYERS to SELLERS with recourse, and credit shall be given BUY-

    ERS for all such assignments as of the date of deposit thereof with ESCROW AGENT.

2. The addendum read in pertinent part:

    With reference to the sale of the San Antonio, Texas property, since at the time of the original Escrow Agreement it was not known who the San Antonio, Texas land would be sold to, it is hereby mutually agreed between the parties that G. C. Daugherty Properties Inc., a (sic) Arkansas Corporation, shall sell the subject San Antonio, Texas land to Tanzana Inc., [another shell corporation owned by Daugherty], who G. C. Daugherty has authority to sign for, for Eighty Thousand Dollars ($80,000.00) and all proceeds of said sale shall be presented into Clinton State Bank, to pay for and release that certain Eighty Thousand Dollars ($80,000) personal note executed by G. C. Daugherty Properties Inc.

    All first lien real estate notes secured by a Deed of Trust on the subject San Antonio, Texas property shall be executed by Tanzana Inc. to G. C. Daugherty Properties Inc. then assigned to Mary Perkins, with recourse by G. C. Daugherty Properties Inc., and delivered to Clinton State Bank, who will send the

Thereafter Daugherty, on behalf of Daugherty Properties conveyed the San Antonio property to Tanzana, Inc., another "shell" corporation owned by Daugherty, and received a promissory note from Tanzana in the amount of $80,000 payable to Daugherty Properties in annual installments of $10,000. On the reverse side of the note Daugherty, on behalf of Daugherty Properties, assigned the note to Mrs. Perkins with recourse against Daugherty Properties. At the same time, Daugherty, now acting on behalf of Tanzana, executed a deed of trust upon the San Antonio property in favor of the Bank to secure the payment of the Tanzana note. Daugherty intentionally failed to note on the deed of trust the assignment to Mrs. Perkins.

Armed with the escrow agreement addendum, the Tanzana deed of trust, the Tanzana promissory note which had been assigned to Mrs. Perkins, and the deed from Daugherty Properties to Tanzana, Daugherty visited the Bank in May of 1973. During this visit Daugherty convinced the Bank's assistant cashier, Mr. McKnight, who was totally inexperienced in real estate matters,[3] that the addendum authorized the release of the documents held pursuant to the original escrow agreement upon receipt of proceeds in the amount of $80,000. The

Bank accepted into escrow the above-listed documents, and in return marked the original promissory note from Daugherty to the Perkins "paid" and delivered it, along with the quitclaim deed for the 800 acres and the warranty deed for the San Antonio property, to Daugherty. Thus, Daugherty relieved himself of personal liability to the Perkins by substituting Daugherty Properties and Tanzana in his stead. No payments were made to the escrow account by Daugherty, Daugherty Properties or Tanzana.[4]

On June 18, 1974, Mrs. Perkins' attorney wrote a letter to the Clinton State Bank concerning the possibility of filing "the appropriate action against all parties who are liable in any way . . . ." On August 6, 1975, Mrs. Perkins filed a complaint against the Bank, whereupon the Bank advised its insurer, Fidelity & Deposit Company, of the complaint and stated its belief that the loss alleged therein was covered by the Fidelity & Deposit Blanket Bond Agreement.

## I. Action Against the Bank.
## Breach of Bank's Fiduciary Duty.

The trial court found several instances in which the Bank breached its fiduciary duty as escrow agent. First, the Bank negligently released the originally es-

---

same for recording with the office of the County Clerk, Bexar County, Texas. Said notes shall become due and payable beginning the 15th day of January 1974, with the principal amount being Ten Thousand Dollars ($10,000.00) plus interest at the rate of 8% per annum.

On the date the proceeds of the sale of the San Antonio, Texas land is presented to the Clinton State Bank, the escrowed deeds on the subject San Antonio, Texas land and the 800 acre tract now being held in escrow by the Clinton State Bank is to be released to G. C. Daugherty Properties Inc. in order that the San Antonio, Texas sale may be legally consumated (sic).

IN WITNESS HEREOF, the parties hereto have set their hands on this the 10th day of April, 1973.

/s/ G. C. Daugherty Properties Inc.
    G. C. Daugherty Properties Inc.
/s/ By G. C. Daugherty, President
/s/ Mary Perkins
    Mary Perkins, for herself and the
    estate of T. O. Perkins

3. The record developed at trial revealed McKnight's lack of sophistication regarding contracts and real estate. He admitted that he did not really understand the escrow agreement or the addendum. Indeed, he did not even know what an "addendum" was. Illustrative of McKnight's ignorance regarding real estate transactions is his admission that he did not understand the legal distinction between a warranty deed and a quitclaim deed.

Despite McKnight's relative lack of qualifications, he had primary responsibility for the Bank's escrow accounts. The record indicates that the Bank was servicing from 200 to 400 escrow accounts at this time. The fees charged for these services were miniscule: $2.50 to open the escrow account, and $.50 for each payment made.

4. The original down payment was paid by Daugherty from money he obtained by mortgaging the 800 acre tract.

crowed documents to Daugherty. Second, the Bank assisted Daugherty in reselling the 800 acres by certifying that Daugherty had no obligation to the Perkins on the land. The Bank failed to notify Mrs. Perkins of the sale and made no attempt to collect for the escrow account the proceeds of the sale. And finally, the Bank was negligent when it filed the deed of trust to the San Antonio property without noting the assignment of said deed to Mrs. Perkins. This omission allowed Daugherty, acting as agent for Tanzana, to later resell the San Antonio property.

The trial judge's finding that the Bank breached its duty as escrow agent is not clearly erroneous. There exists ample evidence to support this finding.

*Causation.*

■ The Bank contends that even if it was negligent, "Daugherty had accomplished all necessary steps to complete his fraud from the date the Escrow was entered into, and no subsequent act or omission by the Bank affected this result." We reject this contention, and affirm, on the basis of the trial court's opinion, the finding that the original escrow agreement did "give to the Perkins substantial security arrangements to protect the payment of the $80,000 balance due on the transaction." We likewise sustain the trial court's decision for the reasons therein given that the Bank's negligence damaged the Perkins by compromising the security provided in the original escrow agreement.

## II.  *The Fidelity Bond.*

In a third party action the Clinton State Bank sought recovery for any possible loss to Perkins under its fidelity bond with Fidelity & Deposit Company of Maryland. The insuring agreement provided protection for:

Loss of Property (*occurring with or without negligence* or violence) through . .

5. The trial court, applying Arkansas law, construed this provision to constitute a condition precedent to recovery on the bond agreement. This ruling is not disputed on appeal. Accordingly, if the trial court correctly found that the

false pretenses . . . while the Property is (or is supposed to be) lodged or deposited within any offices or premises [is an insured event] . . . .
(Emphasis added.)
The district court denied the Bank recovery on the bond because the Bank failed to give timely notice of the loss. The notice provision of the bonding agreement provides that "[a]t the earliest practicable moment after *discovery* of any loss hereunder the Insured shall give the Underwriter written notice thereof . . . ." (Emphasis added.)[5] The trial court held that the letter sent by Mrs. Perkins' attorney to the Bank on June 18, 1974, contained sufficient information when coupled with the knowledge McKnight had, to place the Bank on notice that it had sustained an insured loss. The district court additionally found that "at a minimum this letter required the Bank to inquire further into the Perkins-Daugherty escrow arrangement, and its own transactions with Mr. Daugherty, to determine its potential liability."

We respectfully disagree and reverse the judgment denying the Bank recovery under the policy.

On June 18, Mr. Carden, Mrs. Perkins' attorney, wrote to Howard Johnson, the president of the Clinton State Bank, as follows:

I have been contacted by Mrs. Mary Perkins, widow of Mr. T. O. Perkins, of Dallas, Texas, in regards to the possible filing of legal actions against Mr. G. C. Daugherty and the G. C. Daugherty Properties, Inc., for failure to comply with a certain contract of sales involving the sale of approximately 800 acres of land in Searcy County, Arkansas. The contract and escrow agreement was entered into on February 12th, 1973. Since the Clinton State Bank serves as escrow agent, I am sure that you will be a necessary party, if it becomes eminent (sic) that there is a need for filing suit.

Bank failed to give timely notice, the Bank cannot recover from Fidelity. *See Haskins v. Occidental Life Insurance Co.*, 349 F.Supp. 1192, 1197 (E.D.Ark.1972).

I would like to know what documents you still have in your escrow file at the bank. It is my understanding that you should have a warranty deed, as well as a quitclaim deed, abstract of title and promissory notes on the 800 acres of land. Further, I understand that you also have in your possession certain warranty deeds and quitclaim deeds from G. C. Daugherty and the G. C. Daugherty Properties, Inc., on a certain tract or parcel of land located in San Antonio, Bexar County, Texas.

An addendum was added to the original contract on April 10th, 1973. By its terms, you were to hold the deeds, etc., on the San Antonio property until proceeds of at least $80,000 were paid to you by Mr. Daugherty. At that time, by the terms of the Escrow Agreement, your duty was to release the San Antonio property, as well as the Arkansas property. However, all interest had to first be paid from said land sales before you were to give any type of total release.

Mrs. Perkins is of the opinion that your bank may have released some or all of the properties before the sum of $80,000 plus the interest at the rate of Eight (8%) per cent per annum has been paid.

Further, Mrs. Perkins has received no funds from said land sale, except the initial down payment. She feels, as do I, that Mr. Daugherty has totally failed to comply with the terms of said agreement. Therefore, it is her very strong desire to pursue this matter, and file the appropriate action against all parties who are liable in any way, in regards to their duties, obligations, etc.

Therefore, if you would forward to me a list of all papers pertinent to the matters in your file, and any other information you might have in regards to the whereabouts of Mr. Daugherty, or any other matters relevant, I would be most appreciative. Then, I can begin to go about the task of attempting to determine where the liabilities lie in this case.

The trial court found the June 18 letter triggered "discovery" by the Bank since when the letter was received, McKnight "knew or should have known" that

(1) the January 15th installment had not been paid; (2) Mrs. Perkins had made an inquiry regarding the payment of the first installment under the note; and (3) the Bank had released escrowed documents which were being held as security for Mrs. Perkins. Additionally, he knew, firsthand, the representations of Mr. Daugherty and their inconsistency with Mrs. Perkins's inquiries.

In so holding the court applied a standard of objective reasonableness on the part of the insured in fulfilling the timely notice requirement. Thus the court held that the test was whether a reasonable recipient of the June 18 letter would have interpreted it to mean the release of the escrowed documents was secured by false pretenses and that as such it constituted a loss of property under the policy.

The meaning of "discovery" in timely notice provisions has been judicially construed in several cases dealing with losses due to dishonest employees. *See, e. g., American Surety Co. v. Pauly,* 170 U.S. 133, 144–47, 18 S.Ct. 552, 42 L.Ed. 977 (1898); *United States Fidelity & Guaranty Co. v. Empire State Bank,* 448 F.2d 360, 364–65 (8th Cir. 1971); *Federal Deposit Insurance Corp. v. Aetna Casualty & Surety Co.,* 426 F.2d 729, 738–39 (5th Cir. 1970); *Hidden Splendor Mining Co. v. General Insurance Co.,* 370 F.2d 515, 519 (10th Cir. 1966); *American Employers' Insurance Co. v. Cable,* 108 F.2d 225, 226–27 (5th Cir. 1939); *Midland Bank & Trust Co. v. Fidelity & Deposit Co.,* 442 F.Supp. 960, 971–73 (D.N.J. 1977); *Alfalfa Electric Cooperative, Inc. v. Travelers Indemnity Co.,* 376 F.Supp. 901, 906 (W.D.Okl.1973); *National Mutual Casualty Co. v. Cypret,* 207 Ark. 11, 179 S.W.2d 161, 164 (1944); *Fidelity & Deposit Co. v. Cunningham,* 181 Ark. 954, 28 S.W.2d 715, 719 (1930). Arkansas law accords with the generally accepted definition of discovery as construed in connection with blanket employee fidelity bonds, and has been stated by the Arkansas Supreme Court as follows:

Under the terms of a bond indemnifying the assured against the larceny or embezzlement of the principal and requiring notice by the assured to the insurer on their becoming aware of same, to render the notice necessary, more than mere suspicion is required; circumstances must have existed and been known by the assured, which would have induced the belief in an ordinarily prudent person that a larceny or embezzlement had been committed.

*Fidelity & Deposit Co. v. Cunningham,* 181 Ark. 954, 28 S.W.2d at 719.

From the foregoing authorities, "discovery" of fraud or dishonesty is deemed to occur when the insured actually becomes aware of sufficient facts which would lead a reasonable person to believe that an insured loss has occurred. Mere suspicion of an insured loss by the insured is not sufficient to trigger the notice requirement. *See Federal Deposit Insurance Corp. v. Lott,* 460 F.2d 82, 86–87 (5th Cir. 1972). Contrary to the district court's holding, it appears settled that absent specific terms of the bond the insured has no obligation to exercise diligence to search out facts which might lead to discovery. *See, e. g., American Employers' Insurance Co. v. Cable,* 108 F.2d at 227; *Midland Bank & Trust Co. v. Fidelity & Deposit Co.,* 442 F.Supp. at 972.[6] The well established rule is that the insured under a blanket employee's fidelity bond is not bound to give notice until he has acquired knowledge of some specific fraudulent or dishonest act. As early stated:

> [N]either negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the bank of dishonesty or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty, unless it is otherwise provided in the contract.

*American Employers' Insurance Co. v. Cable,* 108 F.2d at 227.

As Judge Bright observed in *United States Fidelity & Guaranty Co. v. Empire State Bank, supra,* it is not only knowledge of the facts but the facts must be such that a reasonable insured would understand the significance of them connoting the commission of a fraud. 448 F.2d at 365.

■ Under Arkansas law, insurance contracts are to be construed according to general contract principles. Thus, in construing the bonding agreement the notice provision must be considered in connection with the type of loss covered. *See Shepherd v. Mutual Life Insurance Co.,* 63 F.2d 578, 579 (8th Cir. 1933); *Haskins v. Occidental Life Insurance Co.,* 349 F.Supp. 1192, 1198 (E.D.Ark.1972). *Cf. American Surety Co. v. Pauly,* 170 U.S. at 144, 18 S.Ct. 552 (object of contract in insuring against employee defalcations must not be defeated by narrow interpretation of notice provision). Thus, it is appropriate to examine the precise type of loss which the bonding agreement provides protection against.

■ Fidelity & Deposit Company argued in the trial court that the Bank's loss was not an insured event since an experienced escrow agent would not have been taken in by Mr. Daugherty's representations concerning the escrow agreement and addendum. The trial court explicitly rejected the proposition that the level of competence of an experienced escrow agent should be used as an objective standard for determining whether an insured loss occurred. The relevant insuring language of the agreement intended the bonding agreement to cover losses sustained as the result of false pretenses even if the insured negligently released the insured property. More specifically, although a reasonable prudent person may have had or should have had knowledge sufficient to provide notice that releasing the originally escrowed documents was inconsistent with the original escrow agreement, under the terms of the bond,

---

**6.** The district court rejected this proposition on the alleged ground that cases dealing with employee dishonesty are distinguishable from a loss occasioned by false pretenses of a third party. Absent specific terms within the bond to the contrary we feel general principles governing notice under a fidelity bond applicable in both situations.

McKnight's negligent failure to comprehend the significance of these facts did not preclude the loss from being an insured event.

■ If the moment of discovery is ascertained by employing a strict objective standard, a negligent assured which is defrauded will almost always run afoul of the timely notice requirement since "discovery" will occur the moment the loss occurs. A bank that believes the release of escrow documents is entirely proper can hardly be expected to immediately notify its insurer that it has suffered a loss. Thus, what a reasonably competent escrow agent would have concluded from the facts which led to the erroneous release of the originally escrowed documents is not the proper test for determining when the loss was discovered. To hold otherwise would completely vitiate the uncontested finding of the trial court that the parties intended the bonding agreement to cover losses incurred when the Bank negligently accepts as true, false representations.

■ Thus, when the notice provision is considered in the context of the whole bonding agreement, as it must under Arkansas law, *see Great American Indemnity Co. v. Saltzman,* 213 F.2d 743, 746 (8th Cir.), *cert. denied,* 348 U.S. 862, 75 S.Ct. 85, 99 L.Ed. 679 (1954), *and Shepherd v. Mutual Life Insurance Co.,* 63 F.2d at 579, it is clear that the discovery provision should be construed to avoid frustrating the object of the bonding agreement and intent of the parties. Construction of the discovery provision must be consistent with the terms of the insuring agreement. *See American Surety Co. v. Pauly,* 170 U.S. at 144, 18 S.Ct. 552; *Habaz v. Employers' Fire Insurance Co.,* 243 F.2d 784, 786 (8th Cir. 1957); *Smith v. Mutual Life Insurance Co.,* 188 Ark. 1111, 69 S.W.2d 874, 876 (1934); *Aetna Life Insurance Co. v. Spencer,* 182 Ark. 496, 32 S.W.2d 310, 312 (1930). An insuring agreement should not be construed to provide coverage for a defined loss and then simultaneously construed to defeat coverage because of the operative circumstances surrounding the same loss.

Thus, we conclude that although the Bank may have been grossly negligent in releasing the escrowed documents, the subsequent facts must be such that a reasonable recipient of the June 18 letter would have known from the information communicated in the letter that the release of the documents was obtained by Daugherty's false pretenses. A facile understanding of the definition of "discovery" under a fidelity bond has been stated to be:

An oversimplification of the definition is that when the insured learns the facts constituting the alleged dishonesty his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constitutes "discovery."

*Alfalfa Electric Cooperative, Inc. v. Travelers Indemnity Co.,* 376 F.Supp. at 906.

■ Thus, the test of discovery under the present bonding agreement, which insured the Bank against the negligent release of escrow documents based on false misrepresentations, must relate to a reasonable person's subsequent awareness of facts which would convert his negligent appreciation of the facts into actual knowledge of the alleged dishonesty.

■ We find the information contained in the June 18 letter would not have led a reasonable person to reject the Bank's prior conclusions about the escrow arrangement. Indeed, the letter is for the most part consistent with the Bank's view of the escrow arrangement. The third paragraph of the letter unambiguously states that the Bank was required to release the documents relating to the San Antonio and Arkansas property when "*proceeds* of at least $80,000 were paid to [the Bank] by Mr. Daugherty." (Emphasis added.) This interpretation of the escrow agreement and addendum precisely coincides with the Bank's understanding. Furthermore, Mrs. Perkins' apparent unawareness of the $80,000 promissory note resulting from the G. C. Daugherty Properties—Tanzana transaction readily accounts for her belief that the Bank had not received the proceeds required prior to releasing the originally escrowed documents.

The major inconsistency between Mrs. Perkins' position and the Bank's results from Mrs. Perkins' belief that "proceeds" meant cash. While it is true that cash received from the sale of property constitutes proceeds, it is equally true that proceeds are not limited to cash. *See Phelps v. Harris*, 101 U.S. 370, 380, 25 L.Ed. 855 (1879). Indeed, the addendum, which was signed by Mrs. Perkins, explicitly provides that "first lien real estate notes" may be accepted by the Bank as proceeds of the sale of the San Antonio property. The trial court found the addendum was invalid. Nevertheless, as discussed in connection with losses covered by the bonding agreement, the Bank's negligence in releasing the escrow documents and in relying on the addendum cannot preclude the Bank's recovery.

Additional knowledge that the January 15 installment had not been paid and Mrs. Perkins' inquiries in regard thereto also fail to demonstrate any more than a possible breach of contract by Daugherty.[7] If this is so, it hardly implicates the Bank. It is well settled that an escrow agent is not liable for another person's breach of the contract which is subject to the escrow agreement. *Cf. Fulk v. Gay*, 216 Ark. 462, 226 S.W.2d 69, 74 (1950), *and Ford v. Moody*, 169 Ark. 649, 276 S.W. 595, 597 (1925) (failure of grantee to perform conditions of contract did not give rise to escrow agent liability). Furthermore, although the alleged inconsistencies between Daugherty's view of the escrow arrangement and the view apparently held by Mrs. Perkins might have led to further inquiries by the Bank, as previously noted the Bank had no duty under the insuring agreement to diligently seek out the facts.

Thus, we conclude that the letter and facts known by the Bank were not sufficiently inconsistent with the Bank's view of the escrow arrangement to result in discovery of the loss through false pretenses. We therefore conclude that the Bank discovered the loss when served with the complaint in this case—sometime between August 13 and August 16, 1975. Accordingly, the notice of loss given to Fidelity was timely.

The decision of the district court is affirmed in part and reversed in part and the cause remanded with directions that the Bank be awarded judgment under the bonding agreement.

---

7. Although the first installment on the original promissory note was due on January 15, Mrs. Perkins' inquiries to the Bank regarding the delinquent January 15 payment would not necessarily reveal to the Bank that Mrs. Perkins believed the originally escrowed documents were to be retained by the Bank. The payment terms of the second promissory note were precisely the same as those contained in the first. Thus, Mrs. Perkins' statement that the January 15 payment was late is equally consistent with the Bank's view that the second promissory note was properly substituted for the first.